**Slip Op. 00-131**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                         :
SNR ROULEMENTS; SKF USA INC.,            :
SKF FRANCE S.A. and SARMA,               :
                                         :
            Plaintiffs,                  :
                                         :
            v.                           :    Consol. Court No.
                                         :    97-10-01825
UNITED STATES,                           :
                                         :
            Defendant,                   :
                                         :
            and                          :
                                         :
THE TORRINGTON COMPANY,                  :
                                         :
            Defendant-Intervenor.        :
_____:

      Plaintiffs SNR Roulements ("SNR"), SKF USA Inc., SKF France
S.A. and SARMA (collectively "SKF") move pursuant to USCIT R. 56.2
for judgment upon the agency record challenging various aspects of
the Department of Commerce, International Trade Administration's
("Commerce") final determination, entitled <u>Antifriction Bearings
(Other Than Tapered Roller Bearings) and Parts Thereof From France,
Germany, Italy, Japan, Romania, Singapore, Sweden and the United
Kingdom; Final Results of Antidumping Duty Administrative Reviews</u>
("<u>Final Results</u>"), 62 Fed. Reg. 54,043 (Oct. 17, 1997), as amended,
<u>Antifriction Bearings (Other Than Tapered Roller Bearings) and
Parts Thereof From France, Germany, Italy, Japan, Romania,
Singapore[,] Sweden and the United Kingdom; Amended Final Results
of Antidumping Duty Administrative Reviews</u>, 62 Fed. Reg. 61,963
(Nov. 20, 1997). Defendant-intervenor, The Torrington Company
("Torrington"), filed a response to SNR and SKF's USCIT R. 56.2
motions for judgment upon the agency record challenging certain
determinations of Commerce's <u>Final Results</u>.

      Specifically, SNR and SKF contend that Commerce unlawfully:
(1) conducted a duty absorption inquiry under 19 U.S.C. §
1675(a)(4) (1994) for the subject reviews of the applicable
antidumping duty orders covering antifriction bearings from France;

(2) determined that it applied a reasonable duty absorption methodology and that duty absorption had in fact occurred; and (3) excluded below-cost sales from the profit calculation for constructed value under 19 U.S.C. § 1677b(e)(2) (1994).

SNR further contends that Commerce unlawfully: (1) excluded amounts for imputed credit and inventory carrying expenses in its calculation of total expenses for the constructed export price ("CEP") profit ratio; and (2) denied a partial, price-based level of trade adjustment to normal value for CEP sales.

**Held:** SKF's USCIT R. 56.2 motion is denied in part and granted in part. SNR's USCIT R. 56.2 motion is denied in part and granted in part. Torrington's USCIT R. 56.2 motion is denied in part and granted in part. This case is remanded to Commerce to (1) annul all findings and conclusions made pursuant to the duty absorption inquiry conducted for this review; and (2) include all expenses included in "total United States expenses" in the calculation of "total expenses."

[SKF's, SNR's and Torrington's USCIT R. 56.2 motions are denied in part and granted in part. Case remanded.]

Dated: October 13, 2000

Grunfeld, Desiderio, Lebowitz & Silverman LLP (Bruce M. Mitchell and Mark E. Pardo) for SNR.

Steptoe & Johnson LLP (Herbert C. Shelley and Alice A. Kipel) for SKF.

David W. Ogden, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Mark A. Barnett, Patrick V. Gallagher, Myles S. Getlan and David R. Mason, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for defendant-intervenor.

OPINION

**TSOUCALAS, Senior Judge:** Plaintiffs SNR Roulements ("SNR"), SKF USA Inc., SKF France S.A. and SARMA (collectively "SKF") move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 62 Fed. Reg. 54,043 (Oct. 17, 1997), as amended, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore[,] Sweden and the United Kingdom; Amended Final Results of Antidumping Duty Administrative Reviews ("Amended Final Results"), 62 Fed. Reg. 61,963 (Nov. 20, 1997). Defendant-intervenor, The Torrington Company ("Torrington"), filed a response to SNR and SKF's USCIT R. 56.2 motions for judgment upon the agency record challenging certain determinations of Commerce's Final Results.

Specifically, SNR and SKF contend that Commerce unlawfully: (1) conducted a duty absorption inquiry under 19 U.S.C. §

1675(a)(4) (1994) for the subject reviews of the applicable antidumping duty orders covering antifriction bearings from France; (2) determined that it applied a reasonable duty absorption methodology and that duty absorption had in fact occurred; and (3) excluded below-cost sales from the profit calculation for constructed value ("CV") under 19 U.S.C. § 1677b(e)(2) (1994).

SNR further contends that Commerce unlawfully: (1) excluded amounts for imputed credit and inventory carrying expenses in its calculation of total expenses for the constructed export price ("CEP") profit ratio; and (2) denied a partial, price-based level of trade ("LOT") adjustment to normal value ("NV") for CEP sales.

## BACKGROUND

On May 15, 1989, Commerce published antidumping duty orders on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported from several countries, including France.  See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan, 54 Fed. Reg. 20,904.  This case concerns the seventh administrative review of the antidumping duty order on AFBs from France for the period of review ("POR") covering May 1, 1995

through April 30, 1996.[1]  On June 10, 1997, Commerce published the
preliminary results of the seventh review.  See Antifriction
Bearings (Other Than Tapered Roller Bearings) and Parts Thereof
From France, Germany, Italy, Japan, Romania, Singapore, Sweden and
the United Kingdom; Preliminary Results of Antidumping Duty
Administrative Reviews and Partial Termination of Administrative
Reviews ("Preliminary Results"), 62 Fed. Reg. 31,566.  Commerce
published the Final Results on October 17, 1997, see 62 Fed. Reg.
at 54,043, and the Amended Final Results on November 20, 1997, see
62 Fed. Reg. at 61,963.


## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19
U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).


## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in
an antidumping administrative review, the Court will uphold
Commerce's determination unless it is "unsupported by substantial

---

[1] Since the administrative review at issue was initiated after
December 31, 1994, the applicable law in this case is the
antidumping statute as amended by the Uruguay Round Agreements Act,
Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective Jan. 1,
1995).

evidence on the record, or otherwise not in accordance with law."
19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see <u>NTN Bearing Corp. of
America v. United States</u>, 24 CIT ___, ___, 104 F. Supp. 2d 110,
115-16 (2000) (detailing Court's standard of review for antidumping
proceedings).

**DISCUSSION**

## I. Duty Absorption Inquiry

### A. Background

Title 19, United States Code, § 1675(a)(4) provides that
during an administrative review initiated two or four years after
the "publication" of an antidumping duty order, Commerce, if
requested by a domestic interested party, "shall determine whether
antidumping duties have been absorbed by a foreign producer or
exporter subject to the order if the subject merchandise is sold in
the United States through an importer who is affiliated with such
foreign producer or exporter." Section 1675(a)(4) further provides
that Commerce shall notify the International Trade Commission
("ITC") of its findings regarding such duty absorption for the ITC
to consider in conducting a five-year ("sunset") review under 19
U.S.C. § 1675(c) (1994), and the ITC will take such findings into
account in determining whether material injury is likely to

continue or recur if an order were revoked under § 1675(c).  See 19
U.S.C. § 1675a(a)(1)(D) (1994).

On May 31, 1996 and July 9, 1996, Torrington requested that
Commerce conduct a duty absorption inquiry pursuant to § 1675(a)(4)
with respect to various respondents, including SNR and SKF, to
ascertain whether antidumping duties had been absorbed during the
seventh POR.  See Final Results, 62 Fed. Reg. at 54,075.

In the Final Results, Commerce found that duty absorption had
occurred for the POR.  See id. at 54,044.  In asserting authority
to conduct a duty absorption inquiry under § 1675(a)(4), Commerce
first explained that for "transition orders," as defined in 19
U.S.C. § 1675(c)(6)(C) (that is, antidumping duty orders, inter
alia, deemed issued on January 1, 1995), regulation 19 C.F.R. §
351.213(j) provides that Commerce "will make a duty-absorption
determination, if requested, for any administrative review
initiated in 1996 or 1998."  Id. at 54,074.  Commerce concluded
that (1) because the antidumping duty order on the AFBs in this
case has been in effect since 1989, the order is a transition order
pursuant to § 1675(c)(6)(C), and (2) since this review was
initiated in 1996 and a request was made, Commerce had the
authority to make a duty absorption inquiry for the seventh POR.

See id. at 54,075.


B.    Contentions of the Parties

SNR and SKF contend that Commerce lacked authority under §
1675(a)(4) to conduct a duty absorption inquiry for the seventh POR
of the outstanding 1989 antidumping duty orders.  See SNR's Br.
Supp. Mot. J. Agency R. ("SNR's Br.") at 16-19; SKF's Br. Supp.
Mot. J. Agency R. ("SKF's Br.") at 9-16.  In the alternative, SNR
and SKF assert that even if Commerce possessed the authority to
conduct such an inquiry, Commerce's methodology for determining
duty absorption was contrary to law and, accordingly, the case
should be remanded to Commerce to reconsider its methodology.  See
SNR's Br. at 19-22; SKF's Br. at 16-36.


Commerce argues that it: (1) properly construed subsections
(a)(4) and (c) of § 1675 as authorizing it to make a duty
absorption inquiry for antidumping duty orders that were issued and
published prior to January 1, 1995; and (2) devised and applied a
reasonable methodology for determining duty absorption. See Def.'s
Mem. Opp'n Pls.' Mot. J. Agency R. ("Def.'s Mem.") at 22-38.
Torrington generally agrees with Commerce's contentions.  See
Torrington's Resp. Pls.' Mot. J. Agency R. ("Torrington's Resp.")
at 6-12.

## C.    Analysis

In SKF USA Inc. v. United States, 24 CIT ___, 94 F. Supp. 2d 1351 (2000), this Court determined that Commerce lacked statutory authority under § 1675(a)(4) to conduct a duty absorption inquiry for antidumping duty orders issued prior to the January 1, 1995 effective date of the URAA.  See id. at ___, 94 F. Supp. 2d at 1357-59.  The Court noted that Congress expressly prescribed in the URAA that § 1675(a)(4) "must be applied prospectively on or after January 1, 1995 for 19 U.S.C. § 1675 reviews."  Id. at ___, 94 F. Supp. 2d at 1359 (citing § 291 of the URAA).

Because Commerce's duty absorption inquiry, its methodology and the parties' arguments at issue in this case are practically identical to those presented in SKF USA, the Court adheres to its reasoning in SKF USA.  The statutory scheme clearly provides that the inquiry must occur in the second or fourth administrative review after the publication of the antidumping duty order, not in any other review, and upon the request of a domestic interested party.  Accordingly, the Court finds that Commerce did not have statutory authority to undertake a duty absorption investigation for the outstanding 1989 antidumping duty orders in dispute here.

## II.  Profit Calculation for CV

### A.   Background

For this POR, Commerce used CV as the basis for NV "when there were no usable sales of the foreign like product in the comparison market." Preliminary Results, 62 Fed. Reg. at 31,571.  Commerce calculated the profit component of CV using the statutorily preferred methodology of 19 U.S.C. § 1677b(e)(2)(A) (1994).  See Final Results, 62 Fed. Reg. at 54,062.  Specifically, in calculating CV, the statutorily preferred method is to calculate an amount for profit based on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . in connection with the production and sale of a foreign like product [made] in the ordinary course of trade, for consumption in the foreign country."  19 U.S.C. § 1677b(e)(2)(A).

In applying the "preferred" method for calculating CV profit under § 1677b(e)(2)(A), Commerce determined that "the use of aggregate data that encompasses all foreign like products under consideration for NV results in a practical measure of profit that we can apply consistently in each case." Final Results, 62 Fed. Reg. at 54,062.  Also, in calculating CV profit under § 1677b(e)(2)(A), Commerce excluded below-cost sales from the

calculation which it disregarded in the determination of NV pursuant to 19 U.S.C. § 1677b(b)(1). <u>See id.</u> at 54,063.

### B. Contentions of the Parties

SNR and SKF contend that Commerce's use of aggregate data encompassing all foreign like products under consideration for NV in calculating CV profit is contrary to § 1677b(e)(2)(A). <u>See</u> SNR's Br. at 5-10; SKF's Br. at 37-40. Instead, SNR and SKF claim that Commerce should have relied on the alternative methodology of § 1677b(e)(2)(B)(i), which provides a CV profit calculation that is similar to the one Commerce used, but does not limit the calculation to sales made in the ordinary course of trade, that is, below-cost sales are not excluded from the calculation. <u>See</u> SNR's Br. at 10-11; SKF's Br. at 40-52. SKF also asserts that if Commerce's exclusion of below-cost sales from the numerator of the CV profit calculation is lawful, Commerce should nonetheless include such sales in the denominator of the calculation to temper bias which is inherent in Commerce's dumping margin calculations. <u>See</u> SKF's Br. at 53-55.

Commerce responds that it properly calculated CV profit pursuant to § 1677b(e)(2)(A) based on aggregate profit data of all foreign like products under consideration for NV. <u>See</u> Def.'s Mem.

at 7-22. Consequently, Commerce maintains that since it properly calculated CV profit under subparagraph (A) rather than (B) of § 1677b(e)(2), it correctly excluded below-cost sales from the CV profit calculation. See id. at 10-11. Torrington agrees with Commerce's methodology for calculating CV profit. See Torrington's Resp. at 13-15.

## C.   Analysis

In RHP Bearings Ltd. v. United States, 23 CIT ___, 83 F. Supp. 2d 1322 (1999), this Court upheld Commerce's CV profit methodology of using aggregate data of all foreign like products under consideration for NV as being consistent with the antidumping statute. See id. at ___, 83 F. Supp. 2d at 1336. Since Commerce's CV profit methodology and SKF's arguments at issue in this case are practically identical to those presented in RHP Bearings, the Court adheres to its reasoning in RHP Bearings. The Court, therefore, finds that Commerce's CV profit methodology is in accordance with law.

Moreover, since (1) § 1677b(e)(2)(A) requires Commerce to use the actual amount for profit in connection with the production and sale of a foreign like product in the ordinary course of trade, and (2) 19 U.S.C. § 1677(15) (1994) provides that below-cost sales

disregarded under § 1677b(b)(1) are considered to be outside the ordinary course of trade, the Court finds that Commerce properly excluded below-cost sales from the CV profit calculation.

### III. Commerce's Treatment of SNR's Imputed Credit and Inventory Carrying Costs in the Calculation of CEP Profit

#### A.    Background

In calculating CEP, Commerce must reduce the starting price used to establish CEP by "the profit allocated to the expenses described in paragraphs (1) and (2)" of § 1677a(d) (1994).  19 U.S.C. § 1677a(d)(3).  Under 19 U.S.C. § 1677a(f), the "profit" that will be deducted from this starting price will be "determined by multiplying the total actual profit by [a] percentage" calculated "by dividing the total United States expenses by the total expenses."   Id. §  1677a(f)(1),  (2)(A).   Section 1677a(f)(2)(B) defines "total United States expenses" as the total expenses  deducted  under  §  1677a(d)(1)  and  (2),  that  is, commissions, direct and indirect selling expenses, assumptions, and the cost of any further manufacture or assembly in the United States.

Section 1677a(f)(2)(C) establishes a tripartite hierarchy of methods for calculating "total expenses."  First, "total expenses"

will be "[t]he expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country" if Commerce requested such expenses for the purpose of determining NV and CEP. <u>Id.</u> § 1677a(f)(2)(C)(i). If category (i) does not apply, then "total expenses" will be "[t]he expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise." <u>Id.</u> § 1677a(f)(2)(C)(ii). If neither category (i) or (ii) applies, then "total expenses" will be "[t]he expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise." <u>Id.</u> § 1677a(f)(2)(C)(iii). "Total actual profit" is based on whichever category of merchandise is used to calculate "total expenses" under § 1677a(f)(2)(C). <u>See id.</u> § 1677a(f)(2)(D).

SNR reported United States sales that Commerce treated as CEP sales pursuant to 19 U.S.C. § 1677a(b), and Commerce deducted an amount for profit allocated to the expenses enumerated by 19 U.S.C. § 1677a(d)(1) and (2). <u>See</u> 19 U.S.C. § 1677a(d)(3). In the profit calculation, Commerce excluded imputed expenses and carrying costs from the "total actual profit" calculation, defined in § 1677a(f)(2)(D), and from the "total expenses" calculation, defined

in § 1677a(f)(2)(C), but included them in the "total United States

expenses" calculation, defined in § 1677a(f)(2)(B).  SNR objected

to the omission of imputed expenses and carrying costs from "total

actual profit" and "total expenses," and Commerce responded with

the following:

> [S]ections 772(f)(1) and 772(f)(2)(D) of the Tariff Act
> state that the per-unit profit amount shall be an amount
> determined by multiplying the total actual profit by the
> applicable percentage (ratio of total U.S. expenses to
> total expenses) and that the total actual profit means
> the total profit earned by the foreign producer,
> exporter, and affiliated parties.  In accordance with the
> statute, we base the calculation of the total actual
> profit used in calculating the per-unit profit amount for
> CEP sales on actual revenues and expenses recognized by
> the company.   In calculating the per-unit cost of the
> U.S. sales, we have included net interest expense.
> Therefore, we do not need to include imputed interest
> expenses in the "total actual profit" calculation since
> we have already accounted for actual interest in
> computing this amount under section 772(f)(1).  When we
> allocated a portion of the actual profit to each CEP
> sale, we have included imputed credit and inventory
> carrying costs as part of the total U.S. expense
> allocation factor.  This methodology is consistent with
> section 772(f)(1) of the statute, which defines "total
> United States expense" as the total expenses described
> under section 772(d)(1) and (2).  Such expenses include
> both imputed credit and inventory carrying costs.

Final Results, 62 Fed. Reg. at 54,072.


B.    Contentions of the parties

SNR complains that in calculating "total United States

expenses" pursuant to 19 U.S.C. § 1677a(f)(2)(B), Commerce included

amounts for imputed credit and inventory carrying expenses, but failed to include these amounts in its calculation of "total expenses," as defined by 19 U.S.C. § 1677a(f)(2)(C). See SNR's Br. at 12. SNR argues that the plain language of the statute demonstrates that "total United States expenses" is a subset of "total expenses" and, therefore, any expense constituting "'total United States expenses' ([that is], expenses incurred in selling the subject merchandise in the United States)" must also be included in "'total expenses' ([that is], all expenses incurred in selling the subject merchandise in the United States and the foreign like product in the home market)." Id. at 12-13. SNR argues that Commerce should not be permitted to ignore the plain language of the statute. See id.

Commerce maintains that the statute does not address the use of imputed expenses in the calculation of "total expenses" or "total actual profit." See Def.'s Mem. at 40. Commerce considers imputed selling expenses, including imputed credit and inventory carrying costs, to be selling expenses encompassed by § 1677a (d)(1) and (2) and, as such, includes them in the calculation of "total United States expenses." See id. at 42-43. Commerce, however, did not include the imputed expenses in "total actual profit" because "normal accounting principles permit the deduction

of only actual booked expenses not imputed expenses in calculating profit." Id. at 43 (citation omitted). Additionally, Commerce did not include imputed expenses in total actual profit because "its calculation of profit already includes net interest expenses, and, as [a] result, there is no need to include imputed interest expenses in determining total profit" and because the statute specifically directs that actual profit be used. Id.

Commerce also maintains that it did not include imputed expenses in "total expenses" since Commerce is required to calculate "total actual profit" on the same basis as "total expenses" pursuant to 19 U.S.C. § 1677a(f)(2)(D). See id. at 42. Commerce argues that while the statute clearly provides that "total actual profit" is to be based upon the total profit earned "'with respect to the same merchandise for which total expenses are determined,'" the provision for "total expenses" merely encompasses "'all expenses . . . which are incurred by or on behalf of the foreign producer and foreign exporter . . . with respect to the production and sale of such merchandise.'" Def.'s Mem. at 40 (quoting 19 U.S.C. § 1677a(f)(2)(C) and (D)).

Finally, Commerce contends that if "Congress intended that Commerce utilize the same types of expenses for both 'total United

States expenses' and 'total expenses,' it would have made that intent clear," and would not have assigned disparate definitions for each term. Id. at 44. Torrington generally agrees with Commerce. See Torrington's Br. at 16-17.


### C.   Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).   Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." Id. at 842.  "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'"  Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9).  "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning.  Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter."  Id. (citations omitted).

The Court finds that Commerce improperly excluded imputed inventory and carrying costs from "total expenses" when it had included these expenses in "total United States expenses." The plain text of 19 U.S.C. § 1677a provides that Commerce must include imputed credit and inventory carrying costs in "total expenses" when they are included in "total United States expenses." Section 1677a(f)(2)(B) defines "total United States expenses" as the total expenses deducted under § 1677a(d)(1) and (2), that is, commissions, direct and indirect selling expenses, assumptions, and the cost of any further manufacture or assembly in the United States. Section 1677a(f)(2)(C) specifies that:

> [t]he term "total expenses" means <u>all</u> expenses in the first of the following categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise . . . .

(emphasis added). Commerce determined that the applicable category of expenses to be used for calculating "total expenses" is § 1677a(f)(2)(C)(i), and it consists of all of "[t]he expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country." 19 U.S.C. § 1677a(f)(2)(C)(i)).

Thus, "total United States expenses" are certain enumerated

expenses "incurred by or for the account of the producer or exporter, or the affiliated seller in the United States," see § 1677a(d)(1),(2), while "total expenses," in this instance, include

> all expenses . . . incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter . . . with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country . . . .

See § 1677a(f)(2)(C)(i). Reading § 1677a(d) and (f) together makes it apparent that "total expenses" equals "total United States expenses," that is, those expenses incurred in the United States, plus those expenses incurred in France, to produce and sell the subject merchandise in the United States. SNR, therefore, is correct in contending that "total United States expenses" is a subset of "total expenses." Thus, since Commerce determined that imputed inventory and carrying costs were to be included in "total United States expenses," they must be included in "total expenses" as well.[2]

Because the text of the statute resolves the issue, it is unnecessary to proceed any further. Accordingly, the Court remands

---

[2] None of the parties dispute that imputed credit and inventory carrying costs are properly considered United States selling expenses under § 1677a(d) (1994) and, therefore, are a part of "total United States expenses" under 19 U.S.C. § 1677a(f)(2)(B) (1994).

this issue to Commerce.   Commerce is directed to include all expenses included in "total United States expenses" in the calculation of "total expenses."

## IV.   Commerce's Denial of a Partial, Price-based LOT Adjustment to NV for SNR's CEP Sales

### A.    Background

#### 1.    Statutory Provisions

The URAA provides for a specific provision regarding adjustments to NV for differences in LOTs.  The statute provides for NV to be based on:

> the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, <u>to the extent practicable, at the same level of trade as the export price or constructed export price.</u>

19 U.S.C. § 1677b(a)(1)(B)(i) (emphasis added).  The statute also provides for a LOT adjustment to NV under the following conditions:

> The price described in [§ 1677b(a)(1)(B), <u>i.e.</u>, NV,] shall also be increased or decreased to make due allowance for any difference (or lack thereof) between the export price and constructed export price and the price described in [§ 1677b(a)(1)(B)] (other than a difference for which allowance is otherwise made under [§ 1677b(a)]) that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value, if the difference in level of trade--
>     (i) involves the performance of different selling activities; and

(ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.

In a case described in the preceding sentence, the amount of the adjustment shall be based on the price differences between the two levels of trade in the country in which normal value is determined.

19 U.S.C. § 1677b(a)(7)(A).  In sum, to qualify for a LOT adjustment to NV, a party has the burden to show that the following two conditions have been satisfied: (1) the difference in LOT involves the performance of different selling activities; and (2) the difference affects price comparability.  See Statement of Administrative Action[3] ("SAA") at 829 (stating that "if a respondent claims [a LOT] adjustment to decrease normal value, as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment"); see also NSK Ltd. v. United States, 190 F.3d 1321,

---

[3] The Statement of Administrative Action ("SAA") represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements."  H.R. Doc. 103-316, at 656 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.  "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

1330 (Fed. Cir. 1999) (noting that a respondent bears the burden of establishing entitlement to a LOT adjustment).

When the available data does not provide an appropriate basis to grant a LOT adjustment, but NV is established at a LOT constituting a more advanced stage of distribution than the LOT of the CEP, the statute ensures a fair comparison by providing for an additional adjustment to NV known as the "CEP offset." See 19 U.S.C. § 1677b(a)(7)(B). Specifically, the CEP offset provides that NV "shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on the sales of the foreign like product but not more than the amount of such expenses for which a deduction is made under [19 U.S.C. § 1677a(d)(1)(D)]." 19 U.S.C. § 1677b(a)(7)(B).

### 2.   Commerce's LOT Methodology

During this review, and in several prior reviews, Commerce applied the following LOT methodology. See Final Results, 62 Fed. Reg. at 54,055; Preliminary Results, 62 Fed. Reg. at 31,571-72. In accordance with § 1677b(a)(1)(B)(i), Commerce first calculates NV based on exporting-country (or third-country) sales, to the extent practicable, at the same LOT as the United States (EP and CEP) sales. See Preliminary Results, 62 Fed. Reg. at 31,571. When

Commerce is unable to find comparison sales at the same LOT as the EP or CEP sales, it compares such United States sales to sales at a different LOT in the comparison (home or third-country) market. See id.

Where the LOT comparison is between NV sales and EP sales (that is, where the first sale in the United States is to an unaffiliated buyer), Commerce compares the unadjusted, NV starting price with the starting EP, without making any adjustments to EP as provided for under 19 U.S.C. § 1677a(c). See id. at 31,571.

With respect to the LOT methodology for CEP sales, Commerce first calculates CEP by making adjustments to its starting price under 19 U.S.C. § 1677a(d), but before making any adjustments under § 1677a(c). See id. Commerce reasoned that the § 1677a(d) "adjustments are necessary in order to arrive at, as the term CEP makes clear, a 'constructed' EP," that is, it is intended to reflect as closely as possible a price corresponding to an EP between non-affiliated exporters and importers. Final Results, 62 Fed. Reg. at 54,058. Commerce then determines the LOT for the "adjusted" CEP sales. See Preliminary Results, 62 Fed. Reg. at 31,571.

The next step in its LOT analysis is to determine whether home

market sales are at a different LOT than United States (EP or CEP) sales. See id. In making such a determination, Commerce examines whether the "home market sales are at different stages in the marketing process than the U.S. [(EP or CEP)] sales," that is, Commerce "review[s] and compare[s] the distribution systems in the home market and U.S. export markets, including selling functions, class of customer, and the extent and [LOT] of selling expenses for each claimed [LOT]." Id. If the EP or CEP sales and the NV sales are at a different LOT, and the differences in LOT affects price comparability, as manifested in a pattern of consistent price differences between the sales on which NV is based and comparison-market sales at the equivalent LOT of the export transaction, Commerce will make a LOT adjustment under § 1677b(a)(7)(A). See id. If there is no pattern of consistent price differences, no adjustment is permitted. See id. at 31,572. Finally, for CEP sales, if NV is established at a LOT which constitutes a more advanced stage of distribution than the LOT of the CEP, and if there is no basis for determining whether differences in the LOT between NV and CEP affects comparability of their prices, Commerce must make a CEP offset to NV under § 1677b(a)(7)(B). See id.

###   3.   Denial of LOT Adjustment for CEP Sales

With respect to CEP sales, Commerce found that the same LOT as that of the CEP for merchandise under review did not exist for any respondent in the home market except for certain home market sales of respondent NMB/Pelmac.   See Final Results, 62 Fed. Reg. at 54,056.   Commerce was unable to "determine whether there was a pattern of consistent price differences between the [LOTs] based on respondents' [home market] sales of merchandise under review." Id.

In such cases, Commerce looked to alternative methods for calculating LOT adjustments in accordance with the SAA.   See id. In particular, Commerce noted that the SAA states:

> "if information on the same product and company is not available, the level-of-trade adjustment may also be based on sales of other products by the same company.  In the absence of any sales, including those in recent time periods, to different levels of trade by the exporter or producer under investigation, Commerce may further consider the selling expenses of other producers in the foreign market for the same product or other products."

Id. (quoting SAA at 830).   Nevertheless, Commerce determined that it would have been inappropriate to apply the LOT adjustment calculated for NMB/Pelmac to any other respondent, reasoning that "[b]ecause no respondent reported sales in the same market as NMB/Pelmac (i.e., Singapore), we have not used NMB/Pelmac's data as the basis of a level-of-trade adjustment for any other

respondents."  Id.  Consequently, with respect to CEP sales which Commerce was unable to quantify a LOT adjustment, it granted a CEP offset to respondents, including SNR, where the home market sales were at a more advanced LOT than the sales to the United States, in accordance with 19 U.S.C. § 1677b(a)(7)(B).  See id.

With respect to SNR, Commerce applied a CEP offset to NV for all of SNR's CEP sales.  In reaching this result, Commerce first determined for SNR that there was one CEP LOT and two home market LOTs, and that the CEP LOT was not the same as either home market LOT.  Commerce could not grant a LOT adjustment because it had no other information to provide an appropriate basis for such an adjustment.  Commerce determined that a CEP offset adjustment was appropriate for NV transactions matched to CEP, since these transactions were at a more advanced stage of distribution than CEP.  Moreover, contrary to SNR's contentions, Commerce concluded that no provision of the antidumping statute provides for a "partial" LOT adjustment "between two home market [LOTs] where neither level is equivalent to the level of the [United States] sale."  Final Results, 62 Fed. Reg. at 54,057.

### B.    Contentions of the Parties

SNR contends that Commerce improperly denied a price-based LOT

adjustment under § 1677b(a)(7)(A) for CEP sales made in the United States market at a LOT different from the home market sales.  See SNR's Br. at 14.  SNR notes that Commerce found two LOTs in the home market, one corresponding to original equipment manufacturers ("OEM") sales and the other to sales to distributors.  See id.  SNR argues that Commerce should have granted it a partial LOT adjustment based on the price differences between the two levels of trade in the home market.  See id.

SNR notes that the statute directs Commerce to adjust NV for any difference between CEP and NV "'wholly or partly due to a difference in level of trade'" between CEP and NV.  Id. at 15 (quoting § 1677b(a)(7)(A)).  Thus, SNR claims that a LOT adjustment is appropriate even if the difference between United States price and NV is only partly due to a difference in LOT.  See id.  SNR contends that if it has demonstrated that

> (1) distributor sales are at a more advanced level of
> trade than OEM sales; (2) both OEM and distributor sales
> are at a more advanced level of trade than CEP sales; and
> (3) there is a pattern of consistent price difference
> between sales of the same products to OEM and distributor
> customers in the home market

then it is logical to conclude that "the price difference between OEM and distributor sales in the home market at least approximates the level of trade adjustment between CEP sales and home market

distributor sales." Id. In short, SNR claims that the statute permits "the level-of-trade adjustment [to] be calculated using a reliable approximation of the difference between the prices at the two levels of trade," that is, "by using the price difference between OEM and distributor sales to approximate the difference between CEP and distributor sales." Id. at 16.

Commerce claims that it properly denied a LOT adjustment for SNR's CEP sales because SNR failed to establish its entitlement to a LOT adjustment. See Def.'s Mem. at 45. Contrary to SNR's reading of § 1677b(a)(7)(A), Commerce asserts that the statute only provides for a LOT price-based adjustment to NV based upon price differences between CEP and NV and does not authorize a LOT price-based adjustment based upon different LOTs in the home market. See id. at 47; see also Final Results, 62 Fed. Reg. at 54,057 (explaining that Commerce does not read into § 1677b(a)(7)(A)'s "wholly or partly" language the authority to make a LOT adjustment based on differences between two home market LOTs where neither level is equivalent to the level of the United States sale). Commerce, therefore, asserts that since it reasonably interpreted § 1677b(a)(7)(A), the Court should sustain its denial of a LOT adjustment and grant of a CEP offset for all of SNR's CEP transactions. See id. at 50.

Torrington generally agrees with Commerce's positions, emphasizing that Commerce: (1) properly denied a LOT adjustment for SNR's CEP sales; and (2) reasonably interpreted § 1677b(a)(7)(A) as not providing for a "partial" LOT adjustment as contended by SNR. See Torrington's Resp. at 17-20. Accordingly, Torrington contends that this Court should not disturb Commerce's reasonable interpretation of the statute as applied to the record evidence. See id. at 20.


### C.    Analysis

The Court notes that this issue has already been decided in NTN Bearing, 24 CIT at ___, 104 F. Supp. 2d at 125-31. As this Court decided in NTN Bearing, Commerce's decision to deny SNR a partial, price-based LOT adjustment measured by price difference between home market LOTs was in accordance with law. There is no indication in § 1677b(a)(7)(A) that the pattern of price differences between two LOTs in the home market, absent a CEP LOT in the home market, justifies a LOT adjustment. Rather, Commerce's interpretation of § 1677b(a)(7)(A) as only providing a LOT adjustment based upon price differences in the home market between the CEP LOT and the NV LOT was reasonable, especially in light of the existence of the CEP offset to cover situations such as those

at issue here.


### CONCLUSION


For the foregoing reasons, the case is remanded to Commerce to:  (1) annul all findings and conclusions made pursuant to the duty absorption inquiries conducted for the subject review; and (2) include all expenses included in "total United States expenses" in the calculation of "total expenses" for SNR Roulements.  Commerce's final determination is affirmed in all other respects.


_____

NICHOLAS TSOUCALAS

SENIOR JUDGE


Dated:    October 13, 2000

          New York, New York