**Slip Op. 01-13**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                           :
FAG KUGELFISCHER GEORG SCHAFER AG,         :
FAG BEARINGS CORPORATION, SKF USA Inc.,    :
SKF GmbH, NTN BEARING CORPORATION OF       :
AMERICA, NTN KUGELLAGERFABRIK              :
(DEUTSCHLAND) GmbH, INA WALZLAGER          :
SCHAEFFLER KG and                         :
INA BEARING COMPANY, INC.,                 :
                                           :
          Plaintiffs and                   :
          Defendant-Intervenors,           :
                                           :
     v.                                    :    Consol. Court No.
                                           :    97-02-00260
UNITED STATES,                             :
                                           :
          Defendant,                       :
                                           :
          and                              :
                                           :
THE TORRINGTON COMPANY,                    :
                                           :
          Defendant-Intervenor             :
          and Plaintiff.                   :
_____:

     Plaintiffs and defendant-intervenors, FAG Kugelfischer Georg
Schafer AG, FAG Bearings Corporation (collectively "FAG"), SKF USA
Inc., SKF GmbH (collectively "SKF"), NTN Bearing Corporation of
America, NTN Kugellagerfabrik (Deutschland) GmbH (collectively
"NTN"), and INA Walzlager Schaeffler KG and INA Bearing Company,
Inc. (collectively "INA"), move pursuant to USCIT R. 56.2 for
judgment upon the agency record challenging various aspects of the
United States Department of Commerce, International Trade
Administration's ("Commerce") final determination, entitled
Antifriction Bearings (Other Than Tapered Roller Bearings) and
Parts Thereof From France, Germany, Italy, Japan, Singapore, and
the United Kingdom; Final Results of Antidumping Duty
Administrative Reviews ("Final Results"), 62 Fed. Reg. 2081 (Jan.
15, 1997), as amended, Antifriction Bearings (Other Than Tapered
Roller Bearings) and Parts Thereof From France, Germany, Italy,
Japan, and Singapore; Amended Final Results of Antidumping Duty
Administrative Reviews, 62 Fed. Reg. 14,391 (Mar. 26, 1997).
Defendant-intervenor and plaintiff, The Torrington Company

("Torrington"), also moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of Commerce's <u>Final Results</u>.

Specifically, FAG argues that Commerce erred in: (1) calculating constructed value ("CV") profit; (2) failing to match United States sales to similar home-market sales prior to resorting to CV when all home-market sales of identical merchandise have been disregarded; (3) including its zero-value United States transactions in its margin calculations; and (4) excluding amounts for imputed credit and inventory carrying expenses in its calculation of total expenses for the constructed export price ("CEP") profit ratio.

SKF contends that Commerce erred in: (1) calculating CV profit; (2) calculating the CV home-market credit expense rate based on home-market gross unit price while applying that rate to the per unit cost of production; (3) including its zero-value United States transactions in its margin calculations; and (4) failing to match United States sales to similar home-market sales prior to resorting to CV when all home-market sales of identical merchandise have been disregarded.

NTN contends that Commerce erred in: (1) making certain adjustments to the starting price of CEP and denying a price-based level of trade ("LOT") adjustment for CEP sales; (2) recalculating indirect selling expenses without regard to LOT; and (3) determining CEP profit without regard to LOT.

INA contends that Commerce erred in: (1) calculating CV profit; (2) excluding amounts for imputed credit and inventory carrying expenses in its calculation of total expenses for the CEP profit ratio; (3) failing to apply the special rule for merchandise with value added after importation under 19 U.S.C. § 1677a (1994); and (4) failing to convert certain expenses from foreign currency to United States dollars in calculating EP and CEP.

Torrington contends that Commerce erred in its treatment of: (1) SKF's home-market early-payment discounts; (2) SKF's home-market support rebates; (3) SKF's home-market billing adjustments; (4) INA's home-market billing adjustments; and (5) NTN's home-market early-payment discounts.

**Held:** FAG's USCIT R. 56.2 motion is denied in part and granted in part. SKF's USCIT R. 56.2 motion is denied in part and granted in part. NTN's USCIT R. 56.2 motion is denied. INA's USCIT R. 56.2 motion is denied in part and granted in part. Torrington's

USCIT R. 56.2 motion is denied.  The case is remanded to Commerce to: (1) first attempt to match FAG's and SKF's United States sales to similar home-market sales before resorting to CV; (2) exclude any transactions that were not supported by consideration from FAG's and SKF's United States sales databases and to adjust the dumping margins accordingly; (3) include all expenses included in "total United States expenses" in the calculation of "total expenses" for FAG's and INA's CEP profit ratios; (4) reconsider its decision to calculate SKF's home-market credit expense rate based upon price and then apply that rate to cost; and (5) convert certain expenses from foreign currency to United States dollars in calculating EP and CEP for INA.

[FAG's motion is denied in part and granted in part.  SKF's motion is denied in part and granted in part.  NTN's motion is denied. INA's motion is denied in part and granted in part.  Torrington's motion is denied.  Case remanded.]

Dated: February 2, 2001

Grunfeld, Desiderio, Lebowitz & Silverman LLP (Max F. Schutzman, Andrew B. Schroth and Mark E. Pardo) for FAG.

Steptoe & Johnson LLP (Herbert C. Shelley and Alice A. Kipel) for SKF.

Barnes, Richardson & Colburn (Donald J. Unger and Kazumune V. Kano) for NTN.

Arent Fox Kintner Plotkin & Kahn PLLC (Stephen L. Gibson) for INA.

Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Mark A. Barnett, Thomas Fine, Patrick V. Gallagher, Myles S. Getlan, David R. Mason and Dean A. Pinkert, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for Torrington.

OPINION

**TSOUCALAS, Senior Judge:**        Plaintiffs and defendant-intervenors, FAG Kugelfischer Georg Schafer AG, FAG Bearings Corporation (collectively "FAG"), SKF USA Inc., SKF GmbH (collectively "SKF"), NTN Bearing Corporation of America, NTN Kugellagerfabrik (Deutschland) GmbH (collectively "NTN"), and INA Walzlager Schaeffler KG and INA Bearing Company, Inc. (collectively "INA"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews</u> ("<u>Final Results</u>"), 62 Fed. Reg. 2081 (Jan. 15, 1997), as amended, <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, and Singapore; Amended Final Results of Antidumping Duty Administrative Reviews</u>, 62 Fed. Reg. 14,391 (Mar. 26, 1997).   Defendant-intervenor and plaintiff, The Torrington Company ("Torrington"), also moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of Commerce's <u>Final Results</u>.

Specifically, FAG argues that Commerce erred in: (1)

calculating constructed value ("CV") profit; (2) failing to match United States sales to similar home-market sales prior to resorting to CV when all home-market sales of identical merchandise have been disregarded; (3) including its zero-value United States transactions in its margin calculations; and (4) excluding amounts for imputed credit and inventory carrying expenses in its calculation of total expenses for the constructed export price ("CEP") profit ratio.

SKF contends that Commerce erred in: (1) calculating CV profit; (2) calculating the CV home-market credit expense rate based on home-market gross unit price while applying that rate to the per unit cost of production; (3) including its zero-value United States transactions in its margin calculations; and (4) failing to match United States sales to similar home-market sales prior to resorting to CV when all home-market sales of identical merchandise have been disregarded.

NTN contends that Commerce erred in: (1) making certain adjustments to the starting price of CEP and denying a price-based level of trade ("LOT") adjustment for CEP sales; (2) recalculating indirect selling expenses without regard to LOT; and (3) determining CEP profit without regard to LOT.

INA contends that Commerce erred in: (1) calculating CV

profit; (2) excluding amounts for imputed credit and inventory carrying expenses in its calculation of total expenses for the CEP profit ratio; (3) failing to apply the special rule for merchandise with value added after importation under 19 U.S.C. § 1677a (1994); and (4) failing to convert certain expenses from foreign currency to United States dollars in calculating export price ("EP") and CEP.

Torrington contends that Commerce erred in its treatment of: (1) SKF's home-market early-payment discounts; (2) SKF's home-market support rebates; (3) SKF's home-market billing adjustments; (4) INA's home-market billing adjustments; and (5) NTN's home-market early-payment discounts.

## BACKGROUND

This case concerns the sixth review of the antidumping duty order on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported to the United States from Germany during the review period of May 1, 1994 through April 30, 1995. On July 8, 1996, Commerce published the preliminary results of the subject review. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Thailand and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews,

Termination of Administrative Reviews, and Partial Termination of Administrative Reviews ("Preliminary Results"), 61 Fed. Reg. 35,713.  Commerce issued the Final Results on January 15, 1997, see 62 Fed. Reg. 2081, and the Amended Final Results on March 26, 1997, see 62 Fed. Reg. 14,391.

Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act  ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995).  See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

The Court will uphold Commerce's final determination in an antidumping administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing Corp. of America v. United States ("NTN Bearing"), 24 CIT ___, ___,

104 F. Supp. 2d 110, 115-16 (2000) (detailing Court's standard of review in antidumping proceedings).

## DISCUSSION

### I.    Commerce's CV Profit Calculation

#### A.    Background

For this POR, Commerce used CV as the basis for NV "when there were no usable sales of the foreign like product in the comparison market." Preliminary Results, 61 Fed. Reg. at 35,718.  Commerce calculated the profit component of CV using the statutorily preferred methodology of 19 U.S.C. § 1677b(e)(2)(A) (1994).  See Final Results, 62 Fed. Reg. at 2113.  Specifically, in calculating CV, the statutorily preferred method is to calculate an amount for profit based on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . in connection with the production and sale of a foreign like product [made] in the ordinary course of trade, for consumption in the foreign country."  19 U.S.C. § 1677b(e)(2)(A).

In applying the preferred methodology for calculating CV profit, Commerce determined that "the use of aggregate data that encompasses all foreign like products under consideration for NV represents a reasonable interpretation of [§ 1677b(e)(2)(A)] and results in a practical measure of profit that [Commerce] can apply

consistently in each case." Final Results, 62 Fed. Reg at 2113. Also, in calculating CV profit under § 1677b(e)(2)(A), Commerce excluded below-cost sales from the calculation which it disregarded in the determination of NV pursuant to § 1677b(b)(1) (1994). See id. at 2114.

###    B.    Contentions of the Parties

FAG, SKF and INA contend that Commerce's use of aggregate data encompassing all foreign like products under consideration for NV in calculating CV profit is contrary to § 1677b(e)(2)(A). See FAG's Br. Supp. Mot. J. Agency R. ("FAG's Br.") at 4-11; SKF's Br. Supp. Mot. J. Agency R. ("SKF's Br.") at 10-26; INA's Br. Supp. Mot. J. Agency R. ("INA's Br.") at 9-16. Instead, FAG, SKF and INA claim that Commerce should have relied on alternative methodologies such as the one described by § 1677b(e)(2)(B)(i), which provides a CV profit calculation that is similar to the one Commerce used, but does not limit the calculation to sales made in the ordinary course of trade, that is, below-cost sales are not excluded from the calculation. See id. SKF also asserts that if Commerce's exclusion of below-cost sales from the numerator of the CV profit calculation is lawful, Commerce should nonetheless include such sales in the denominator of the calculation to temper bias which is inherent in the agency's dumping margin calculations. See SKF's Br. at 26-30.

Commerce responds that it properly calculated CV profit pursuant to § 1677b(e)(2)(A), based on aggregate profit data of all foreign like products under consideration for NV. See Def.'s Mem. Partial Opp'n Pls.' Mots. J. Agency R. ("Def.'s Mem.") at 13-26. Consequently, Commerce maintains that since it properly calculated CV profit under subparagraph (A) rather than (B) of § 1677b(e)(2), it correctly excluded below-cost sales from the CV profit calculation. See id. at 16-17. Torrington generally agrees with Commerce's contentions. See Torrington's Resp. at 9-18.

## C. Analysis

In RHP Bearings Ltd. v. United States, 23 CIT ___, 83 F. Supp. 2d 1322 (1999), this Court upheld Commerce's CV profit methodology of using aggregate data of all foreign like products under consideration for NV as being consistent with the antidumping statute. See id. at ___, 83 F. Supp. 2d at 1336. Since Commerce's CV profit methodology and the parties' arguments at issue in this case are practically identical to those presented in RHP Bearings, the Court adheres to its reasoning in RHP Bearings. The Court, therefore, finds that Commerce's CV profit methodology is in accordance with law.

Moreover, since (1) § 1677b(e)(2)(A) requires Commerce to use

the actual amount for profit in connection with the production and sale of a foreign like product in the ordinary course of trade, and (2) 19 U.S.C. § 1677(15) (1994) provides that below-cost sales disregarded under § 1677b(b)(1) are considered to be outside the ordinary course of trade, the Court finds that Commerce properly excluded below-cost sales from the CV profit calculation.

## II. Commerce's Matching United States Sales to Similar Home-Market Sales Prior to Resorting to CV

FAG and SKF maintain that Commerce erred in resorting to CV without first attempting to match United States sales, that is, EP or CEP sales, to similar home-market sales in instances where home-market sales of identical merchandise have been disregarded because they were out of the ordinary course of trade. See FAG's Br. at 11-12; SKF's Br. at 38-39. FAG and SKF maintain that a remand is necessary to bring Commerce's practice in accord with the United States Court of Appeals for the Federal Circuit's ("CAFC") decision in Cemex, S.A. v. United States, 133 F.3d 897, 904 (Fed. Cir. 1998). Commerce agrees with FAG and SKF. See Def.'s Mem. at 27.

The Court agrees with FAG, SKF and Commerce. In Cemex, the CAFC reversed Commerce's practice of matching a United States sale to CV when the identical or most similar home-market model failed the cost test. See 133 F.3d at 904. The CAFC stated that "[t]he plain language of the statute requires Commerce to base foreign

market value [(now NV)] on nonidentical but similar merchandise [(foreign like product under the amendments to the URAA)] . . . rather than [CV] when sales of identical merchandise have been found to be outside the ordinary course of trade." Id. In light of Cemex, this matter is remanded so that Commerce can first attempt to match United States sales to similar home-market sales before resorting to CV.

## III. Zero-Value United States Transactions

FAG and SKF argue that in light of NSK Ltd. v. United States, 115 F.3d 965, 975 (Fed. Cir. 1997), the Court should remand the matter to Commerce to exclude their zero-value transactions from their margin calculations. See FAG's Br. at 12-13; SKF's Br. at 35-37. FAG and SKF maintain that United States transactions at zero value, such as prototypes and samples, do not constitute true sales and, therefore, should be excluded from the margin calculations pursuant to NSK. See id. The identical issue was decided by this Court in SKF USA Inc. v. United States, Slip Op. 99-56, 1999 WL 486537, *7 (June 29, 1999).

Torrington concedes that a remand may be necessary in light of NSK, but argues that further factual inquiry by Commerce is necessary to determine whether the zero-price transactions were truly without consideration. See Torrington's Resp. at 19-23.

Torrington argues that only if the transactions are truly without consideration can they fall within NSK's exclusion.  See id.

Commerce concedes that the case should be remanded to it to exclude the sample transactions for which FAG and SKF received no consideration from their United States sales databases.  See Def.'s Mem. at 27-28.

Commerce is required to impose antidumping duties upon merchandise that "is being, or is likely to be, sold in the United States at less than its fair value."  19 U.S.C. § 1673(1) (1994).  A zero-priced transaction does not qualify as a "sale" and, therefore, by definition cannot be included in Commerce's NV calculation.  See NSK, 115 F.3d at 975 (holding "that the term 'sold' . . . requires both a transfer of ownership to an unrelated party and consideration.").  Thus, the distribution of AFBs for no consideration falls outside the purview of 19 U.S.C. § 1673.  Consequently, the Court remands to Commerce to exclude any transactions that were not supported by consideration from SKF's United States sales database and to adjust the dumping margins accordingly.

**IV.  Commerce's Treatment of FAG's and INA's Imputed Credit and Inventory Carrying Costs in the Calculation of CEP Profit**

**A.  Background**

In calculating CEP, Commerce must reduce the starting price used to establish CEP by "the profit allocated to the expenses described in paragraphs (1) and (2)" of § 1677a(d) (1994).  19 U.S.C. § 1677a(d)(3).  Under 19 U.S.C. § 1677a(f), the "profit" that will be deducted from this starting price will be "determined by multiplying the total actual profit by [a] percentage" calculated "by dividing the total United States expenses by the total expenses."  Id. § 1677a(f)(1), (2)(A).  Section 1677a(f)(2)(B) defines "total United States expenses" as the total expenses deducted under § 1677a(d)(1) and (2), that is, commissions, direct and indirect selling expenses, assumptions and the cost of any further manufacture or assembly in the United States.

Section 1677a(f)(2)(C) establishes a tripartite hierarchy of methods for calculating "total expenses."  First, "total expenses" will be "[t]he expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country" if Commerce requested such expenses for the purpose of determining NV and CEP.  Id. § 1677a(f)(2)(C)(i).  If category (i) does not apply, then "total expenses" will be "[t]he expenses incurred with respect to the

narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise." Id. § 1677a(f)(2)(C)(ii). If neither category (i) or (ii) applies, then "total expenses" will be "[t]he expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise." Id. § 1677a(f)(2)(C)(iii). "Total actual profit" is based on whichever category of merchandise is used to calculate "total expenses" under § 1677a(f)(2)(C). See id. § 1677a(f)(2)(D).

FAG and INA reported United States sales that Commerce treated as CEP sales pursuant to 19 U.S.C. § 1677a(b), and Commerce deducted an amount for profit allocated to the expenses enumerated by 19 U.S.C. § 1677a(d)(1) and (2). See 19 U.S.C. § 1677a(d)(3). In the profit calculation, Commerce excluded imputed expenses and carrying costs from the "total actual profit" calculation, defined in § 1677a(f)(2)(D), and from the "total expenses" calculation, defined in § 1677a(f)(2)(C), but included them in the "total United States expenses" calculation, defined in § 1677a(f)(2)(B). FAG objected to the omission of imputed expenses and carrying costs from "total expenses," and Commerce responded by stating the following:

> Sections [1677a(f)(1) and 1677a(f)(2)(D)] of [Title 19] state that the per-unit profit amount shall be an amount determined by multiplying the total actual profit by the applicable percentage (ratio of total U.S. expenses to

total expenses) and that the total actual profit means the total profit earned by the foreign producer, exporter, and affiliated parties. In accordance with the statute, we base the calculation of the total actual profit used in calculating the per-unit profit amount for CEP sales on actual revenues and expenses recognized by the company. In calculating the per-unit cost of the U.S. sales, we have included net interest expense. Therefore, we do not need to include imputed interest expenses in the "total actual profit" calculation since we have already accounted for actual interest in computing this amount under section [1677a(f)(1)].

　　When we allocated a portion of the actual profit to each CEP sale, we have included imputed credit and inventory carrying costs as part of the total U.S. expense allocation factor. This methodology is consistent with section [1677a(f)(1)] of the statute which defines "total United States expense" as the total expenses described under section [1677a(d)(1) and (2)]. Such expenses include both imputed credit and inventory carrying costs.

Final Results, 62 Fed. Reg. at 2126-27.

### B.    Contentions of the parties

FAG and INA complain that in calculating "total United States expenses" pursuant to 19 U.S.C. § 1677a(f)(2)(B), Commerce included amounts for imputed credit and inventory carrying expenses, but failed to include these amounts in its calculation of "total expenses," as defined by 19 U.S.C. § 1677a(f)(2)(C). See FAG's Br. at 13-14; INA's Br. at 16-17. FAG and INA argue that the plain language of the statute demonstrates that any expense constituting "total United States expenses" must also be included in "total expenses." See id.

Commerce maintains that the statute does not address the use of imputed expenses in the calculation of "total expenses" or "total actual profit." See Def.'s Mem. at 31. Commerce based its decision to exclude the expenses from "total actual profit" and "total expenses" on its "conclusion that the imputed expenses were already accounted for through the inclusion of actual interest expenses in 'total actual profit' and 'total expenses.'" See id. at 35. Commerce acknowledges that imputed and actual expenses may differ, but maintains that "they serve as a reasonable surrogate for one another in the calculation of actual profit." Id.

Finally, Commerce contends that the Court should not entertain INA's claim since it was not raised during the administrative proceedings. See id. at 37. Torrington generally agrees with Commerce. See Torrington's Resp. at 24-27.

## C.   Analysis

Commerce and Torrington argue that INA has not properly exhausted its administrative remedies with respect to Commerce's treatment of INA's imputed credit and inventory carrying costs in the calculation of CEP profit. The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for consideration before raising them to the Court. See Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143,

155 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action."). In this case, however, there is no absolute requirement of exhaustion in the Court of International Trade. See Alhambra Foundry Co. v. United States, 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988). Section 2637(d) of Title 28 of the United States code directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies. See Cemex, S.A., 133 F.3d at 905. "[E]ach exercise of judicial discretion in not requiring litigants to exhaust administrative remedies" has been characterized as "'an exception to the doctrine of exhaustion.'" Alhambra Foundry, 12 CIT at 347, 685 F. Supp. at 1256 (citing Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986)).

In the past, the Court has exercised its discretion to obviate exhaustion where: (1) requiring it would be futile, see Rhone Poulenc, S.A. v. United States, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984) ("it appears that it would have been futile for

plaintiffs to argue that the agency should not apply its own regulation"), or would be "inequitable and an insistence of a useless formality" as in the case where "there is no relief which plaintiff may be granted at the administrative level," United States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 201, 544 F. Supp. 883, 887 (1982); (2) a subsequent court decision has interpreted existing law after the administrative determination at issue was published, and the new decision might have materially affected the agency's actions, see Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986); (3) the question is one of law and does not require further factual development and, therefore, the court does not invade the province of the agency, see id.; R.R. Yardmasters of America v. Harris, 721 F.2d 1332, 1337-39 (D.C. Cir. 1983); and (4) the plaintiff had no reason to suspect that the agency would refuse to adhere to "clearly applicable precedent," Philipp Bros. v. United States, 10 CIT 76, 79-80, 630 F. Supp. 1317, 1320-21 (1986).

Although INA did not raise this issue during the administrative process, the Court exercises it discretion to rule on the issue here. The danger that the Court decides the issue before Commerce has the opportunity to examine it at the administrative level is not present since Commerce already had the opportunity to consider the same issue vis-a-vis FAG in the instant

case, and INA's arguments do not materially differ from those raised by FAG in the instant case. INA may be excused from its failure to raise the issue before Commerce since Commerce in fact considered the issue. See Krupp Thyssen Nirosta GmbH v. United States, Slip Op. 00-89, 2000 WL 1118114, *3 n.1 (July 31, 2000) (plaintiffs not precluded from bringing forth argument not raised at administrative level because record showed that Commerce actually considered issue); Natural Resources Def. Council, Inc. v. United States Envtl. Prot. Agency, 824 F.2d 1146, 1151 (1987) (same); Washington Ass'n for Television and Children v. FCC, 712 F.2d 677, 682 n.10 (D.C. Cir. 1983) (citing cases).

In SNR Roulements v. United States, 24 CIT ___, ___, 118 F. Supp. 2d 1333, 1338-41 (2000), this Court determined that "Commerce improperly excluded imputed inventory and carrying costs from 'total expenses' when it had included these expenses in 'total United States expenses'" because such action was contrary to the plain meaning of 19 U.S.C. § 1677a. This Court remanded the issue to Commerce, directing it to "include all expenses included in 'total United States expenses' in the calculation of 'total expenses.'" Id. at 1341.

Since Commerce's methodology and FAG's and INA's arguments in this case are practically identical to those presented in SNR Roulements, the Court adheres to its reasoning in SNR Roulements.

The Court, therefore, finds that Commerce's methodology was not in accordance with law.  The Court remands this issue to Commerce to include all expenses included in "total United States expenses" in the calculation of "total expenses" for both FAG and INA.

**V.    CV Home-Market Credit Expense Rate**

SKF contends that Commerce erred in "calculating a home market credit expense rate based on price, but applying that rate to cost."  See SKF's Br. at 30.  Specifically, SKF contends that Commerce "computed a credit expense rate based on the ratio of home market credit expense to home market gross unit price" when "calculating an average home market credit expense to be deducted from CV."  Id.  Commerce applied the home-market credit expense rate to the COP, rather than price, of each model to derive a per unit amount for home-market credit expense.  See id.  Commerce then deducted the per unit expense amount in the CV calculation.  See id.  SKF maintains that applying a home-market credit expense rate based upon price to cost is contrary to the "fundamental principle inherent in all antidumping rate and factor calculations, that the calculation of the rate and its application must be consistent."  SKF's Reply Supp. Mot. J. Agency R. ("SKF's Reply") at 20.

Commerce agrees that it erred "by calculating a home market credit expense rate based upon price but applying that rate to

cost," and asks the Court to remand the matter for recalculation of SKF's home-market credit cost. Def.'s Mem. at 70-71. Torrington, however, maintains that Commerce's methodology is reasonable and should be affirmed. See Torrington's Resp. at 35-37.

In light of the foregoing, the Court remands this issue to Commerce to reconsider its decision to calculate the home-market credit expense rate based upon price and then apply that rate to cost.

## VI. Commerce's Determination of the Level of Trade for NTN's CEP Sales and Denial of a Level of Trade Adjustment

### A. Background

#### 1. Statutory Provisions

Under pre-URAA antidumping law, there were no specific provisions providing for an adjustment to foreign market value ("FMV") for any difference in LOT between United States price (now EP or CEP) and FMV. Commerce, however, promulgated a regulation stating that: (1) it normally would calculate FMV and United States price based on sales at the same commercial LOT; and (2) if such sales were insufficient to permit an adequate comparison, Commerce would calculate FMV based on such or similar sales at the most comparable LOT in the United States market, making appropriate adjustments for differences affecting price comparability. See 19

C.F.R. § 353.58 (1994); see generally NEC Home Elecs., Ltd. v.

United States, 54 F.3d 736, 739 (Fed. Cir. 1995) (discussing 19

C.F.R. § 353.58).

The URAA amended the antidumping statute to provide for a

specific provision regarding adjustments to NV for differences in

LOTs.  Instead of FMV, see 19 U.S.C. § 1677b (1988), the statute

now provides for NV, see URAA § 233(a)(1), 108 Stat. at 4898

(replacing the term FMV with NV), which shall be based on:

> the price at which the foreign like product is first sold
> (or, in the absence of a sale, offered for sale) for
> consumption in the exporting country, in the usual
> commercial quantities and in the ordinary course of trade
> and, to the extent practicable, at the same level of
> trade as the export price or constructed export price.

19 U.S.C. § 1677b(a)(1)(B)(i) (emphasis added).  The statute also

provides for an LOT adjustment to NV under the following

conditions:

> The price described in [§ 1677b(a)(1)(B), i.e., NV,]
> shall also be increased or decreased to make due
> allowance for any difference (or lack thereof) between
> the export price or constructed export price and the
> price described in [§ 1677b(a)(1)(B)] (other than a
> difference for which allowance is otherwise made under [§
> 1677b(a)]) that is shown to be wholly or partly due to a
> difference in level of trade between the export price or
> constructed export price and normal value, if the
> difference in level of trade--
>         (i) involves the performance of different
>     selling activities; and
>         (ii) is demonstrated to affect price compara-
>     bility, based on a pattern of consistent price
>     differences between sales at different levels of
>     trade in the country in which normal value is

> determined.
> In a case described in the preceding sentence, the amount of the adjustment shall be based on the price differences between the two levels of trade in the country in which normal value is determined.

19 U.S.C. § 1677b(a)(7)(A).  In sum, to qualify for an LOT adjustment to NV, a party has the burden to show that the following two conditions have been satisfied: (1) the difference in LOT involves the performance of different selling activities; and (2) the difference affects price comparability.  See Statement of Administrative Action ("SAA"),[1] H.R. Doc. 103-316, at 829 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 (stating that "if a respondent claims [an LOT] adjustment to decrease normal value, as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment"); see also NSK Ltd. v. United States, 190 F.3d 1321, 1330 (Fed. Cir. 1999) (noting that a respondent bears the burden of establishing entitlement to

---

[1]  The Statement of Administrative Action ("SAA") represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements."  H.R. Doc. 103-316, at 656 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.  "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

an LOT adjustment).

When the available data does not provide an appropriate basis to grant an LOT adjustment, but NV is established at an LOT constituting a more advanced stage of distribution than the LOT of the CEP, the statute ensures a fair comparison by providing for an additional adjustment to NV known as the "CEP offset." See 19 U.S.C. § 1677b(a)(7)(B). Specifically, the CEP offset provides that NV "shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made [from CEP] under [19 U.S.C. § 1677a(d)(1)(D)]." 19 U.S.C. § 1677b(a)(7)(B).

### 2.   Commerce's LOT Methodology

During this review, Commerce applied the following LOT methodology. See Final Results, 62 Fed. Reg. at 2105; Preliminary Results, 61 Fed. Reg. at 35,718. In accordance with § 1677b(a)(1)(B)(i), Commerce first calculates NV based on exporting-country (or third-country) sales, to the extent practicable, at the same LOT as the United States (EP and CEP) sales. See Final Results, 62 Fed. Reg. at 2105. When Commerce is unable to find comparison sales at the same LOT as the EP or CEP sales, it

compares such United States sales to sales at a different LOT in the comparison (home or third-country) market.  See id.

With respect to the LOT methodology for CEP sales, Commerce first calculates CEP by making adjustments to its starting price under 19 U.S.C. § 1677a(d), but before making any adjustments under § 1677a(c).  See id.  Commerce reasoned that the § 1677a(d) "adjustments are necessary in order to arrive at, as the term CEP makes clear, a 'constructed' export price," that is, it is intended to reflect as closely as possible a price corresponding to an EP between non-affiliated exporters and importers.  Id. at 2107.  Once the starting price is adjusted under § 1677a(d), Commerce has a "hypothetical transaction price that would likely have been charged to the first purchaser in the United States had that purchaser been unaffiliated to the exporter."  Def.'s Mem. at 49-50.

The next step in its LOT analysis is to determine whether sales in the home-market exist that are at the same LOT as the adjusted CEP sales.  In making such a determination, Commerce examines whether the home-market sales are "at different stages in the marketing process than the export price or CEP," that is, Commerce reviews and compares the distribution systems in the home-market and U.S. export markets, "including selling functions, class of customer, and the level of selling expenses for each type of sale."  Final Results, 62 Fed. Reg. at 2105.

If the adjusted CEP sales and the NV sales are at a different LOT, Commerce then considers whether an LOT adjustment is appropriate. In determining the propriety of an adjustment to NV, Commerce determines whether two conditions specified in § 1677b(a)(7)(A) are satisfied: (1) "there must be differences between the actual selling activities performed by the exporter at the level of trade of the U.S. sale and the level of trade of the comparison market sales used to determine NV"; and (2) "the differences must affect price comparability as evidenced by a pattern of consistent price differences between sales at the different levels of trade in the market in which NV is determined." Preliminary Results, 61 Fed. Reg. at 35,718. If there is no pattern of consistent price differences, no adjustment is made. Finally, for CEP sales, if NV is established at an LOT which constitutes a more advanced stage of distribution than the CEP LOT, and if there is no appropriate basis for granting an LOT adjustment, Commerce makes a CEP offset to NV under § 1677b(a)(7)(B). See id.

## B.   Contentions of the Parties

NTN contends that Commerce improperly denied a price-based LOT adjustment under § 1677b(a)(7)(A) for CEP sales made in the United States market at an LOT different from the home-market sales. See

NTN's Mem. Supp. Mot. J. Agency R. ("NTN's Mem.") at 6-8.  In particular, NTN argues, inter alia, that Commerce incorrectly determined NTN's CEP LOT because the agency failed to use the sale to the first unaffiliated purchaser in the United States to determine NTN's CEP LOT.  See id. at 7-8.  In other words, according to NTN, if Commerce had used the CEP starting price, that is, without any § 1677a(d) adjustment, to determine CEP LOT, NTN would have satisfied the statutory requirements for an LOT adjustment for its CEP sales.  See id. at 7; NTN's Reply at 8.  In support of its position, NTN cites Borden Inc. v. United States, 22 CIT __, 4 F. Supp. 2d 1221 (1998), where the court determined that Commerce's methodology of making a § 1677a(d) adjustment to CEP prior to the LOT analysis contravened the purpose of § 1677b(a)(7)(A).  See NTN's Reply at 5-6 (citing Borden, 4 F. Supp. 2d at 1241).  NTN requests that the Court adopt the holding of Borden and remand the LOT issue to Commerce to determine NTN's CEP LOTs prior to any § 1677a(d) deductions and, afterwards, to grant NTN a price-based LOT adjustment for its CEP sales.  See id. at 7.

Commerce, in turn, argues that it properly determined the LOT for NTN's CEP sales after deducting expenses and profit from the price to the first unaffiliated purchaser in the United States pursuant to § 1677a(d) because § 1677b(a)(7)(A), which provides for an LOT adjustment, requires Commerce to compare CEP, not the

"unadjusted" starting price of CEP, with NV. See Def.'s Mem. at 52-61. Commerce notes CEP is defined in § 1677a(b) as the price at which the subject merchandise is first sold (or agreed to be sold) in the United States as "adjusted" under § 1677a(d). See id. at 52-53. According to Commerce, the adjusted CEP price is to be compared to prices in the home-market based on the same LOT whenever it is practicable; when it is not practicable and the LOT difference affects price comparability, Commerce makes an LOT adjustment. See id. at 54. Commerce makes a CEP offset when "the home market sales are at a different [LOT] but there is not sufficient data to determine whether the difference in levels of trade affects price comparability." Id. If the CEP price is not adjusted before it is compared under the approach advocated by NTN and Torrington, "there will always be substantial deductions from the resale prices in the United States (because they are mandatory)," but they "will be compared to resale prices in the home market from which virtually [there will] never be any equivalent deductions," thus creating a substantial imbalance and a skewed comparison between NV and CEP. Id. at 55 (emphasis in the original).

Commerce further asserts that the Court should not follow Borden because it is not based upon persuasive statutory analysis. See id. at 56-61. Commerce maintains that the court in Borden

rejected the plain language of the statute because although §
1677b(a)(7)(B) does not specify that § 1677a(d) adjustments are to
be made to the CEP starting price, "if the statute is read as a
whole, it is obvious that the term 'level of trade of the
constructed export price' refers to an adjusted price because
'constructed export price' means the price to the unaffiliated
purchaser in the United [States] as adjusted pursuant to section
1677a(b)." Id. at 58.

Commerce claims that it properly denied an LOT adjustment for
NTN's CEP sales because NTN failed to establish its entitlement to
an LOT adjustment. See id. at 61-65. Commerce was unable to
calculate an LOT adjustment because "NTN did not have a level of
trade equivalent to the CEP level of trade in the home market,"
making it impossible to quantify the difference in price between
the CEP LOT and the home-market LOT. Id. at 64. Commerce
demonstrates that NTN does not contend that Commerce failed to
properly apply its methodology to its data, but "only that it
should have used the starting price for determining the CEP" LOT.
Id.

Torrington generally agrees with Commerce's positions,
emphasizing that: (1) Commerce correctly made § 1677a(d)
adjustments to the starting price of CEP prior to determining an
LOT for NTN's CEP sales; and (2) properly denied an LOT adjustment

for NTN's CEP sales. <u>See</u> Torrington's Resp. at 39-47. Accordingly, Torrington contends that this Court should not disturb Commerce's reasonable interpretation of the statute as applied to the record evidence. <u>See id.</u> SKF generally agrees with the contentions of Commerce and Torrington. <u>See</u> SKF's Resp. at 43-59.


**C.    Analysis**

Under the first step of <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 457 U.S. 837, 842 (1984), the Court must ascertain whether the antidumping statute's plain language speaks to the precise question at issue. Here, 19 U.S.C. § 1677b(a)(7) specifically provides that to make an LOT adjustment to NV, Commerce must determine if there is "a difference in level of trade between the . . . constructed export price and normal value." In other words, Commerce must first calculate CEP before performing its LOT analysis. Title 19, United States Code, § 1677a provides the following guidance for determining CEP:

(b) Constructed export price

The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, <u>as adjusted under subsections (c) and (d) of this section.</u>

(emphasis added).[2]

Thus, the starting price under § 1677a(b) must be "adjusted under subsections (c) and (d)" of § 1677a to determine CEP. Also, the language of § 1677a(c) as well as § 1677a(d) clearly provides that subsection (c) and (d) adjustments must be made to the starting price used to "establish" CEP. See 19 U.S.C. § 1677a(c); 19 U.S.C. § 1677a(d) ("For purposes of this section, the price used to establish constructed export price shall also be reduced by . . . ."). The Court, therefore, finds that § 1677a unambiguously requires Commerce to make subsection (c) and (d) adjustments to § 1677a(b)'s starting price to determine CEP.

This Court has already ruled on this issue. See NTN Bearing, 24 CIT at ___, 104 F. Supp. 2d at 127-31; SNR Roulements, 24 CIT at ___, 118 F. Supp. 2d at 1341-45. This Court found that since the language of § 1677a is unambiguous in how to calculate CEP, it would not follow the rationale of Borden. See generally Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what

---

[2] Although § 1677a does not specifically state that it applies to § 1677b(a)(7), the Court finds that both sections of "Part IV–General Provisions" of "Subtitle IV–Countervailing and Antidumping Duties" are to be read together. See generally Freytag v. Comm'r, 501 U.S. 868, 877 (1991) (expressing "a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment") (citation and internal quotation marks omitted).

it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete'") (citations omitted); VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1579 (Fed. Cir. 1990) ("It is axiomatic that statutory interpretation begins with the language of the statute.  If . . . the language is clear and fits the case, the plain meaning of the statute will be regarded as conclusive") (citations omitted).  Any imbalance that § 1677a's definitions of CEP creates with respect to Commerce's LOT analysis when comparing NV with CEP must be rectified by Congress because neither the Court nor Commerce may rewrite the statute.

Thus, the Court finds that Commerce properly made § 1677a(d) adjustments to NTN's starting price in order to arrive at CEP and make its LOT determination.  The Court also finds that Commerce's decision to deny NTN an LOT adjustment is supported by substantial evidence.  Section 1677b(a)(7)(A) permits Commerce to make an LOT adjustment "if the difference in level of trade . . . involves the performance of different selling activities[] and . . . is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined."  With respect to CEP sales, Commerce found that the same LOT as that of the CEP for merchandise under review did not exist for any

respondent in the home market; therefore, Commerce was unable to "determine whether there was a pattern of consistent price differences between the [LOTs] based on respondent's [home-market] sales of merchandise under review."  See Final Results, 62 Fed. Reg. at 2106.

Commerce looked to alternative methods for calculating LOT adjustments in accordance with the SAA.  See id.  In particular, Commerce noted that the SAA states:

> "if the information on the same product and company is not available, the [LOT] adjustment may also be based on sales of other products by the same company.  In the absence of any sales, including those in recent time periods, to different levels of trade by the exporter or producer under investigation, Commerce may further consider the selling expenses of other producers in the foreign market for the same product or other products."

Id. (quoting SAA at 830).  Commerce did not have the information that would have supported the use of these alternative methods. See id.  Consequently, with respect to CEP sales which Commerce was unable to quantify an LOT adjustment, it granted a CEP offset to respondents, including NTN, where the home-market sales were at a more advanced LOT than the sales to the United States, in accordance with 19 U.S.C. § 1677b(a)(7)(B).  See id.  In sum, Commerce acted well within the directive of the statute in denying the LOT adjustment and granting a CEP offset instead.  See 19 U.S.C. § 1677b(a)(7).

**VII. Commerce's Recalculation of NTN's Home-Market and United States Indirect Selling Expenses Without Regard to Level of Trade**

### A.    Background

In its preliminary calculations, Commerce had calculated NTN's United States indirect selling expenses without regard to LOTs. See Final Results, 62 Fed. Reg. at 2105.  NTN argued that Commerce should have recalculated NTN's United States selling expenses to reflect its reported indirect selling expense allocations based on LOT.  See id.  Torrington, in turn, contended that Commerce should reject NTN's indirect selling expense allocations based on LOT because they bear no relationship to the way in which NTN incurs the expenses.  See id.

Commerce responded that in three prior reviews it determined that NTN's methodology for allocating its indirect selling expenses based on LOTs did not bear any relationship to the manner in which NTN incurred these United States selling expenses and its methodology led to distorted allocations.  See id.  Commerce noted that the court upheld its methodology in NTN Bearing Corp. v. United States ("NTN"), 19 CIT 1221, 1233-34, 905 F. Supp. 1083, 1094-95 (1995).  See id.  Commerce "found that the allocations NTN calculated according to levels of trade were misplaced and that it could not conclusively demonstrate that its [indirect selling expenses] vary across levels of trade."  Id.  Because Commerce

found during this POR that NTN "did not provide sufficient evidence demonstrating that its selling expenses are attributable to levels of trade," the agency recalculated NTN's United States indirect selling expenses to represent such selling expenses for all United States sales.  Id.

### B.    Contentions of the Parties

Although recognizing that in NTN, 19 CIT at 1233-34, 905 F. Supp. at 1094-95, the Court decided against an LOT adjustment for NTN's indirect selling expenses because it failed to quantify the expenses at each LOT, NTN "respectfully requests that this court reconsider this issue based on the facts of this case."  See NTN's Mem. at 10-11.

NTN also asserts that if Commerce had conducted its LOT analysis properly, it would have found more than one LOT in the United States.  See NTN's Reply at 9.  NTN notes that Commerce has accepted NTN's methodology of allocating its United States indirect selling expenses based on LOT in previous reviews and even stated that NTN's "'methodology prevents, rather than creates, certain distortions.'"   NTN's Reply at 10-11 (quoting Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Final Results of Antidumping

Duty Administrative Reviews and Revocation in Part of an Antidumping Finding, 61 Fed. Reg. 57,629, 57,636 (Nov. 7, 1996)). Accordingly, NTN requests that the Court remand the matter to Commerce and instruct it to recalculate NTN's margins by using NTN's reported indirect selling expense LOT allocations. See id. at 11.

Commerce responds that it found only one LOT in the United States market and, moreover, there is no evidence of quantitative analysis tying the allocation method to the expenses. See Def.'s Mem. at 66. Commerce asserts that NTN only quantified the allocation itself and, therefore, the Court should sustain the agency's recalculation of NTN's United States indirect selling expenses. See id. at 66-67.

Torrington supports Commerce and argues that NTN has not distinguished the current review from previous reviews in which the Court affirmed Commerce's recalculation of NTN's indirect selling expenses without regard to LOT. See Torrington's Resp. at 48-49.

### C.  Analysis

The Court disagrees with NTN that it adequately supported its LOT adjustment claim for its reported United States indirect selling expenses. Although NTN purports to show that it incurred different selling expenses at different trade levels, the evidence

to which it points does not show that its allocation methodology reasonably quantifies the United States indirect selling expenses incurred at different LOTs. See <u>NTN Bearing</u>, 24 CIT at ___, 104 F. Supp. 2d at 131-33; <u>NTN</u>, 19 CIT at 1234, 905 F. Supp. at 1095. Given that NTN had the burden before Commerce to establish its entitlement to an LOT adjustment, its failure to provide the requisite evidence compels the Court to conclude that it has not met its burden of demonstrating that Commerce's denial of the LOT adjustment was not supported by substantial evidence and was not in accordance with law. See <u>NSK</u>, 190 F.3d at 1330.

Accordingly, the Court denies NTN's remand request for recalculation of its margins using its reported United States indirect selling expense data.

### VIII. Constructed Export Price Profit Calculation Without Regard to Level of Trade

#### A.    Background

In calculating CEP, Commerce must reduce the starting price used to establish CEP by "the profit allocated to expenses described in paragraphs (1) and (2)" of § 1677a(d).  19 U.S.C. § 1677a(d)(3).  Under 19 U.S.C. § 1677a(f) (1994), the "profit" that will be deducted from this starting price will be "determined by multiplying the total actual profit by [a] percentage" calculated "by dividing the total United States expenses by the total expenses."    Id. §  1677a(f)(1),  (2)(A).    Section 1677a(f)(2)(B) defines "total United States expenses" as the total expenses deducted under §  1677a(d)(1)  and  (2),  that is, commissions, direct and indirect selling expenses, assumptions, and the cost of any further manufacture or assembly in the United States.  Section 1677a(f)(2)(C) establishes a tripartite hierarchy of methods for calculating "total expenses."   First, "total expenses" will be "[t]he expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country" if Commerce requested such expenses for the purpose of determining NV and CEP.   Id. § 1677a(f)(2)(C)(i).   If Commerce did not request these expenses, then "total expenses" will be "[t]he expenses incurred with respect to the narrowest category of merchandise sold in the United States

and the exporting country which includes the subject merchandise."
Id. § 1677a(f)(2)(C)(ii).  If the data necessary to determine
"total expenses" under either of these methods is not available,
then "total expenses" will be "[t]he expenses incurred with respect
to the narrowest category of merchandise sold in all countries
which  includes  the  subject  merchandise."      Id. §
1677a(f)(2)(C)(iii).  "Total actual profit" is based on whichever
category of merchandise is used to calculate "total expenses" under
§ 1677a(f)(2)(C).  See id. § 1677a(f)(2)(D).

During this POR, NTN argued that profit levels differed by LOT
and had an effect on prices and CEP profit and, therefore, Commerce
should calculate CEP profit on an LOT-specific basis rather than
for each class or kind of merchandise.  See Final Results, 62 Fed.
Reg. at 2125.  NTN reasoned that § 1677a(f)(2)(C) "expresses a
preference  for  the  [CEP]  profit  calculation  to  be  done  as
specifically as possible with respect to sales in the appropriate
markets of the subject merchandise or the narrowest category of
merchandise which includes the subject merchandise."  Id.

Commerce rejected NTN's argument, concluding that:

Neither the statute nor the SAA require us to calculate
CEP profit on bases more specific than the subject
merchandise as a whole.  Indeed, while we cannot at this
time rule out the possibility that the facts of a
particular case may require division of CEP profit, the
statute and SAA, by referring to "the" profit, "total
actual profit," and "total expenses" imply that we should

prefer calculating a single profit figure. NTN's suggested approach would also add a layer of complexity to an already complicated exercise with no guarantee that the result will provide any increase in accuracy. We need not undertake such a calculation (see Daewoo Electronics v. International Union, 6 F.3d 1511, 1518-19 (CAFC 1993)). Finally, subdivision of the CEP-profit calculation would be more susceptible to manipulation. Congress has specifically warned us to be wary of such manipulation of the profit allocation (see S. Rep. 103-412, 103d Cong., 2d Sess at 66-67).

Id.

### B.    Contentions of the Parties

NTN contends that Commerce erred by refusing to calculate CEP profit on LOT-specific basis. See NTN's Mem. at 11. Highlighting the "narrowest category of merchandise" language of § 1677a(f)(2)(C)(ii) and (iii), NTN again argues that there is a clear statutory preference that profit be calculated on the narrowest possible basis. See id. at 11-12. Moreover, NTN claims that since CV profit is calculated by LOT and matching is by LOT, CEP profit should be calculated to account for differences in LOT. See id. at 12. NTN asserts that the mere fact that a calculation is difficult is not a valid reason to sacrifice accuracy. See id. at 13. NTN further asserts that Commerce's speculation that an adjustment is susceptible to manipulation provides no grounds for rejecting an adjustment. See id. NTN, therefore, requests that the Court remand the issue to Commerce to calculate CEP profit on an LOT-specific basis.

Commerce responds that it properly determined CEP profit without regard to LOT.  See Def.'s Mem. at 68-70.  Commerce notes, inter alia, that § 1677a(f) does not refer to LOT, that is, the statute does not require that CEP profit be calculated on an LOT-specific basis.  See id. at 69.  In addition, Commerce asserts that even assuming that a narrower basis for the CEP-profit calculation is warranted in some circumstances, NTN has not provided any factual support for such a deviation from Commerce's standard methodology for calculating CEP profit.  See id. at 70.  Torrington generally agrees with Commerce's CEP-profit calculation.  See Torrington's Resp. at 49-52.

## C.    Analysis

Section 1677a(f), as Commerce correctly notes, does not make any reference to LOT.  Accordingly, the Court's duty under Chevron is to review the reasonableness of Commerce's statutory interpretation.  See IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992) (quoting Chevron, 467 U.S. at 844).

This Court upheld Commerce's refusal to calculate CEP on an LOT-specific basis in NTN Bearing, 24 CIT at ___, 104 F. Supp. 2d at 133-35, finding it to be reasonable and in accordance with law.  The Court examined the language of the statute and concluded that the statute clearly contemplates that, in general, the "narrowest

category" will include the class or kind of merchandise that is within the scope of an investigation or review. The Court based its conclusion on its examination of subsections (ii) and (iii) of § 1677a(f)(C)'s "total expense" definition. Both subsections refer to "expenses incurred with respect to the narrowest category of merchandise . . . which includes the subject merchandise." The term "subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921." 19 U.S.C. § 1677(25).

Accordingly, as in <u>NTN Bearing</u>, the Court finds that Commerce reasonably interpreted § 1677a(f) in refusing to apply a narrower subcategory of merchandise such as one based on LOT. The Court, moreover, agrees with Commerce's conclusion that a "subdivision of the CEP-profit calculation would be more susceptible to manipulation," a result that Congress specifically warned Commerce to prevent. <u>Final Results</u>, 62 Fed. Reg. at 2125. Finally, even if the Court were to assume that a narrower basis for calculating CEP profit would be justified under some circumstances, the Court agrees with Commerce that NTN failed to provide adequate factual support of how the CEP profit calculation was distorted by Commerce's standard methodology.

**IX.  Commerce's Refusal to Apply the Special Rule for Further Manufacturing to INA's Constructed Export Price Sales – Exhaustion of Administrative Remedies**

Commerce argues that the Court should not entertain INA's arguments because INA failed to raise the issue at the administrative level, thus failing to exhaust its administrative remedies.  See Def.'s Mem. at 39-40.  As discussed above, the application of the doctrine of exhaustion of administrative remedies is subject to several exceptions and ultimately lies within the discretion of the Court.  See 28 U.S.C. § 2637(d); Cemex, 133 F.3d at 905.

INA waived its right to have this claim heard by the Court by not bringing it forth during the administrative process.[3] Additionally, there are no factors urging the Court to excuse INA's failure to present this issue during the administrative process.

---

[3]      Additionally, none of the exceptions to the doctrine of exhaustion apply.  Although the Court considered Commerce's refusal to apply the special rule under similar circumstances in RHP Bearings Ltd. v. United States, 24 CIT ___, ___, 120 F. Supp. 2d 1116, 1119-26 (2000), this case does not fall within the exception to the exhaustion doctrine that applies when subsequent court decisions interpret existing law after the administrative determination at issue was published that might have materially affected the agency's actions.  See Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986).  The interpretation of existing law set forth in RHP Bearings, if applied to the instant dispute, would not necessarily have a substantial impact upon Commerce's determination, since RHP Bearings involved the reasonableness of Commerce's exercise of discretion under 19 U.S.C. § 1677a(e), and the question of reasonableness must be decided on a case-by-case basis.

INA presents no reason, let alone a compelling reason, for its failure to raise this claim below.  Indeed, it appears that INA had several opportunities to raise the issue before Commerce.  See Def.'s Mem. at 39-43.  Allowing INA to proceed with its claim before the Court would be unfair and contrary to the principles underlying the exhaustion doctrine.  See McKart v. United States, 395 U.S. 185, 194-95 (1969) (party should be prohibited from seeking judicial review of a claim that was not appealed through the administrative process because: (1) "judicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise"; (2) notions of judicial efficiency favor the requirement of exhaustion; (3) "notions of administrative autonomy require that the agency be given a chance to discover and correct its own errors"; and (4) it is also "possible that frequent and deliberate flouting of the administrative process could weaken the effectiveness of an agency by encouraging people to ignore its procedures.").  Accordingly, the Court will not entertain INA's arguments regarding Commerce's refusal to apply the special rule for further manufacturing to INA's CEP sales.

**X.  Commerce's Failure to Convert Certain Expenses from Foreign Currency to United States Dollars**

INA alleges that Commerce erred in failing to convert certain

domestic inland freight and marine insurance expenses from Deutsche

Marks ("DM") to United States dollars in calculating CEP and EP.

See INA's Br. at 22-23.    Commerce agrees that it committed this

error.   See Def.'s Mem. at 43-44.   Torrington agrees that these

errors should be corrected.   See Torrington's Mem. Supp. Mot. J.

Agency R. ("Torrington's Mem.") at 57.

In light of the foregoing, the Court remands this issue to

Commerce to convert the relevant expenses from DM to United States

dollars before calculating CEP and EP.

## XI.  Commerce's Treatment of Certain Discounts, Rebates and Billing Adjustments Reported by SKF, INA and NTN

### A.    Background

SKF's Home-Market Support Rebates

SKF reported certain allocated home-market support rebates on

a customer-specific basis.  In accepting SKF's reporting of home-

market support rebates on a customer-specific basis, Commerce

stated the following:

> We agree with SKF Germany regarding early payment
> discounts, support rebates, and billing adjustment 2.
> SKF Germany reported these adjustments to the best of its
> ability. SKF Germany did not report these adjustments on
> a transaction-specific basis due to their very nature and
> we find that SKF Germany's methodology is not
> unreasonably distortive.    Further, there is no
> information on the record that would lead us to believe
> that these adjustments were not granted in proportionate
> amounts with respect to sales of out-of-scope and in-

scope merchandise.  Torrington's argument that SKF's allocation is distortive is purely speculative. . . . Due to the nature of support rebates, transaction-specific reporting is not feasible. . . . SKF Germany grants these rebates to distributors/dealers to ensure that they obtain a minimum profit level on sales to select customers.  Hence, because SKF Germany does not issue these rebates based on specific sales to the distributor/dealers, SKF Germany cannot report transaction-specific rebate amounts.  Therefore, we find that SKF Germany's reporting methodology is not unreasonably distortive and that SKF Germany responded to the best of its ability.

Final Results, 62 Fed. Reg. at 2094.

### SKF's and NTN's Home-market Early-payment Discounts

SKF reported certain home-market early-payment discounts.  SKF granted these discounts to eligible customers by multiplying the unit price by the percentage discount for which the customer was eligible.  See Home Market Verification Report of SKF GmbH (SKF) Sales Questionnaire Response for 1994-95 Administrative Review (12/31/96) (Case No. A-428-801) at 13.  SKF multiplied the resulting figure by a factor "representing the ratio of total early payment discounts actually taken on the merchandise under review by all customers in the channel of distribution to total early payment discounts on subject merchandise for which the channel of customers were eligible."  Id.  Commerce accepted the discounts as reported by SKF, stating that its "findings at verification indicate that it is not feasible for SKF Germany to allocate this adjustment more specifically, given the large volume of transactions involved, the

level of detail contained in SKF's normal accounting records, and
the time constraints imposed by the statutory deadlines . . . ."
Final Results, 62 Fed. Reg. at 2094.  Commerce was satisfied that
SKF's reporting methodology reflected the way in which SKF Germany
does business, that SKF Germany reported the discounts to the best
of its ability, and that the methodology was not unreasonably
distortive.  See id.

NTN also claimed home-market early-payment discounts.  In
accepting these discounts, Commerce stated the following:

> NTN Germany explained in its response that the
> adjustments were based on agreements with customers for
> eligible products.  Resulting total amounts for each
> customer were allocated to sales to the customer.  Based
> on NTN Germany's response and information on the record
> from verifications of previous reviews, we believe [that
> the] respondent has acted to the best of its ability in
> reporting the adjustments and its allocations are not
> unreasonably distortive.

Final Results, 62 Fed. Reg. at 2097.


### SKF's and INA's Home-Market Billing Adjustments

SKF reported home-market billing adjustment two, for which "it
did not issue credit/debit notes on a transaction-specific basis."
Home Market Verification Report of SKF GmbH (SKF) Sales
Questionnaire Response for 1994-95 Administrative Review (12/31/96)
(Case No. A-428-801) at 12.  SKF indicated that "these adjustments
were typically general credit/debit memos covering a group of

transactions for which there was a mistake in billing over a period

of time."    Id.    SKF "aggregated these notes and calculated

customer-specific billing adjustment factors," then allocated the

billing adjustments over all sales to the customer.   Id.

In accepting SKF's methodology, Commerce stated the following:

> With respect to billing adjustment 2, SKF Germany
> reported billing adjustments not associated with a
> specific transaction.  These adjustments include credit
> or debit notes that SKF Germany issued relating to
> multiple invoice lines.  SKF Germany could not tie these
> adjustments to a specific transaction because the billing
> adjustments reported in this field were part of credit or
> debit notes, issued to the customer, that related to
> multiple invoices, products, or multiple invoice lines.
> In these cases, the most feasible reporting methodology
> that SKF Germany could use was a customer-specific
> allocation, given the large volume of transactions
> involved in these AFBs reviews and the time constraints
> imposed by the statutory deadlines.  For these reasons,
> we find that this methodology is not unreasonably
> distortive.

Final Results, 62 Fed. Reg. at 2094.

INA reported two types of billing adjustments.  One was made

on an invoice-specific basis, with each invoice covering a single

transaction.  See Final Results, 62 Fed. Reg. 2096.  The first

billing adjustment is not at issue here.  The second billing

adjustment involved invoices containing more than one transaction,

where, according to Commerce's Final Results, "INA used the same

fixed and constant percentage for all transactions on the invoice."

Id.  In accepting INA's adjustment as reported, Commerce stated

that INA's use of the same fixed and constant percentage for all transactions on an invoice was the equivalent of reporting the adjustment on a transaction-specific basis. Id. Commerce verified the billing adjustment and, finding no discrepancies, allowed both upward and downward billing adjustments. See id.

### B.    Contentions of the Parties

Torrington alleges that Commerce improperly accepted SKF's home-market support rebates, home-market early-payment discounts and home-market billing adjustment number two because SKF failed to show that: (1) all reported amounts directly related to specific products; (2) its methodology was non-distortive; and (3) it made its best efforts to report the transactions on a more precise basis. Torrington alleges that Commerce improperly accepted INA's home-market billing adjustments and NTN's home-market early-payment discounts for essentially the same reasons it improperly accepted SKF's adjustments.

Torrington maintains that the Court of Appeals for the Federal Circuit ("CAFC") has clearly defined "direct" adjustments to price as those that "vary with the  quantity sold, or that are related to a particular sale," and Commerce cannot treat adjustments that do not meet this definition as direct. Torrington's Mem. at 12 (citing Torrington Co. v. United States ("Torrington CAFC"), 82

F.3d 1039, 1050 (Fed. Cir. 1996) (quotations omitted)).  Torrington
contends that here Commerce "redefined 'direct' to achieve what
<u>Torrington CAFC</u> had previously disallowed" by allowing respondents
to report allocated post-sale price adjustments ("PSPAs") if they
acted to the best of their abilities in light of their record-
keeping systems and the results were not unreasonably distortive.
<u>Id.</u> at 14.     Torrington acknowledges that this Court has already
approved of Commerce's practice as applied under post-URAA law in
<u>Timken Co. v. United States</u> ("<u>Timken</u>"), 22 CIT ___, 16 F. Supp. 2d
1102 (1998), but asks the Court to reconsider its approval.  <u>See</u>
Torrington's Reply at 5-6.

    Furthermore, Torrington maintains that the amendments to the
URAA did not modify the distinction between direct and indirect
adjustments established under pre-URAA law such as <u>Torrington CAFC</u>.
<u>See</u> Torrington's Mem. at 15 (citing 19 U.S.C. § 1677a(d)(1)(B), (D)
(1994) and § 1677b(a)(7)(B) (1994)).  Torrington is not convinced
that the SAA accompanying the URAA contradicts its contentions.
<u>See id.</u> at 16 (citing SAA at 823-24).

    Torrington also contends that even under its new methodology,
Commerce's determination was not supported by substantial evidence
inasmuch as respondents failed to show that (1) their reporting
methods did not result in distortion; and (2) they put forth their
best efforts to report the information on a more precise basis.

See id. at 25. Torrington emphasizes that respondents have the burden of showing non-distortion and best efforts, and having failed to do so, must not benefit from the adjustment. See id. Torrington, therefore, requests that this Court reverse Commerce's determination with respect to the various PSPAs and remand the case to Commerce with instructions to disallow all of the claims. See id. at 26.

Commerce responds that Torrington erred in relying on Torrington CAFC because the case does not stand for the proposition that direct price adjustments may only be accepted when they are reported on a transaction-specific basis. See Def.'s Mem. at 88. Rather, the Torrington CAFC court "merely overturned a prior Commerce[] practice . . . of treating certain allocated price adjustments as indirect expenses," id. (citing Torrington CAFC, 82 F.3d at 1047-51), and "does not address appropriate allocation methodologies" used in reporting the price adjustments in question, id. at 88-89 (quoting Final Results, 62 Fed. Reg. at 2091). Also contrary to Torrington's assertion, Commerce did not consider Torrington CAFC as addressing proper allocation methodologies; rather, Commerce only viewed Torrington CAFC as holding that "Commerce could not treat as indirect selling expenses 'improperly' allocated price adjustments." Id. at 90. Commerce notes that pursuant to its new methodology, it does not consider price

adjustments to be any type of selling expense, either direct or indirect, and, therefore, Torrington's argument is not only without support, but also inapposite to Torrington CAFC. See id.

Additionally, Commerce argues that its findings are supported by substantial evidence. See id. at 91. With respect to SKF's discounts, rebates and price adjustments, Commerce maintains that "(1) SKF had reported the adjustments on the most specific basis possible and, thus, had cooperated to the best of its ability; and (2) the allocation method was not distortive." Id. at 92. Commerce argues that at verification, it found no evidence that SKF's adjustments were granted disproportionately on out-of-scope merchandise, showing that SKF's allocation "effectively removed any rebates paid on out-of-scope merchandise from the amount of the actual customer-specific adjustment." Id. at 92-93.

Commerce argues that Torrington's interpretation of the holding of Torrington CAFC is incorrect, and that the case is irrelevant because Commerce did not deduct the adjustments as direct selling expenses. See id. at 94. With respect to Torrington's argument that SKF did not carry the burden of proving non-distortion, Commerce responded that it "would defeat the purpose of permitting allocations if Commerce also required respondents to provide transaction-specific adjustments so as to prove that the allocation is non-distortive." Id. at 95. Commerce

argues that such a requirement would contravene the spirit of §
1677m.  See id.

   With respect to SKF's early-payment discounts, Commerce argues
that it "reviewed SKF's methodology for this particular discount
and concluded that it was reasonable and avoided distortions." Id.
at 96.  Commerce verified that in granting the discount, SKF did
not favor out-of-scope merchandise.  See id. at 96-97.  Commerce
maintains that the result of the methodology was that the discount
was attributable to merchandise in "exact proportion to the amount
of the invoices made up of subject merchandise" and all out-of-
scope merchandise was removed from the discount before reporting to
Commerce.  Id. at 97.

   Commerce argues that Torrington's arguments for rejection of
the discounts are without merit because: (1) its reliance on
Torrington CAFC is misplaced; (2) Torrington failed to recognize
that SKF made an adjustment for the fact that certain customers did
not take advantage of the discounts to which they were entitled,
and Commerce verified that SKF's adjustment did not have a
significant effect; and (3) SKF satisfied its burden of showing
entitlement to the claimed adjustments.  See id. at 98.

   With respect to SKF's home-market support rebates, Commerce
argues that the record demonstrates that such rebates are by their

nature customer-specific, and they were granted and reported on a customer-specific basis.  See id. at 93.  Commerce argues that no potential for distortion exists because at verification, Commerce did not find any provisions in SKF's rebate agreements favoring out-of-scope merchandise.  See id. (citing Home Market Verification Report of SKF GmbH (SKF) Sales Questionnaire Response for 1994-95 Administrative Review (12/31/96) (Case No. A-428-801) at 15).

With respect to SKF's home-market billing adjustments, Commerce maintains that it "verified that the manner in which the adjustments were granted did not produce a danger of distortion." Id. at 98.  Commerce argues that there is no danger of random distortion nor a danger of deliberate manipulation.  See id. at 99. Commerce maintains that Torrington's reliance on Torrington CAFC is misplaced because that case does not resolve whether Commerce can make direct adjustments for allocated adjustments.  See id. at 100.

Commerce argues that because INA's home-market billing adjustments were reported on an invoice-specific basis, a simple allocation would have removed the effects of out-of-scope merchandise.  See id. at 101.  Commerce, however, was able to verify that INA had not reported sales on out-of-scope merchandise. See id.  Because INA did not report sales on out-of-scope merchandise, the sales on which INA reported billing adjustments did not include out-of-scope merchandise.  See id.  If there was

more than one transaction on an invoice, INA allocated the billing adjustment over all transactions using a fixed percentage. See id. Thus, Commerce argues that there is no possibility of distortion, and dismisses Torrington's arguments as invalid. See id. at 101-103.

As with SKF's early-payment discounts, Commerce argues that NTN's discounts are inherently non-distortive, since for this discount to create distortion, "the discount would have to be granted if the invoice for the non-subject merchandise was paid early, but the invoice for the subject merchandise was not paid early." Id. at 103. Commerce argues that there was no need for verification in this review since: (1) the early-payment discount is inherently non-distortive, having been granted only on in-scope merchandise; and (2) Commerce had verified NTN's discounts during prior reviews, and there is no evidence that NTN changed its business practice since the last verification. See id. at 103-05. Commerce maintains that Torrington's reliance upon Torrington CAFC is misplaced and, contrary to Torrington's contentions, it is not always possible to report early-payment discounts on a transaction-specific basis. See id. at 104-05.

SKF concurs with Commerce's position. SKF maintains that Commerce's allowance of its home-market rebates, home-market cash discounts and home-market billing adjustments is consistent with

the holding of <u>Torrington CAFC</u>.  <u>See</u> SKF's Resp. at 4-5, 9-19.  SKF

argues that it reported the adjustments according to the way in

which they were incurred.  <u>See id.</u>  SKF argues that the current

antidumping statute, the intent of Congress and the precedent of

this Court support its position.  <u>See id.</u>  SKF maintains that it

acted to the best of its ability in reporting the adjustments in a

reasonable and non-distortive manner, and that Commerce's allowance

of the adjustment was supported by substantial evidence.

SKF also contends that the record demonstrates that Commerce

properly accepted SKF's information under § 1677m(e), which

provides that "information not meeting all of [Commerce's]

requirements must still be accepted if timely, verifiable,

reliable, the party acted to the best of its ability, and the data

can be used without undue difficulties."  <u>Id.</u> at 10, 19-21.

SKF contends that substantial record evidence supports

Commerce's conclusions regarding SKF's reporting capabilities and

its decision to allow the adjustments.  <u>See id.</u> at 21-26.  SKF

contends that its inability to report the adjustments on a more

specific basis results from the nature of the adjustments and,

moreover, it would be unreasonable to expect SKF to alter its

dealings with its customers to fit Torrington's conception of the

antidumping reporting requirements.  <u>See id.</u>  SKF argues that the

same methodology used in the subject review was used in a previous

review where no distortion was found and, furthermore, there is no evidence of distortion in the subject review. See id. at 26-28. Finally, SKF argues that Commerce's decision to allow the adjustments was supported by substantial evidence because they were reported in the manner in which they were granted and as specifically as possible given SKF's accounting records, and Commerce verified the accuracy of SKF's reporting. See id. at 29-39.

INA argues that it provided billing adjustment information in accordance with Commerce's request, and Commerce properly accepted the information. See INA's Br. Opp'n Torrington at 3. INA points out that its information was verified by Commerce and found to be accurate. See id. at 6. INA also argues that its billing adjustment was not allocated, as Commerce stated in the Final Results, but that it was reported on a product- and invoice-specific basis, making the allocation issue raised by Torrington inapplicable. See id. at 9.

NTN argues that Commerce properly accepted its reporting of early-payment discounts. See NTN's Resp. at 5. NTN maintains that it reported these discounts to the best of its ability, and that Commerce properly found its methodology to be sound and non-distortive. See id. NTN argues that Commerce's acceptance of its early-payment discounts was in accordance with the statute, the

SAA, legislative intent and Commerce's current policy. See id. at 6-7. NTN disagrees with Torrington's contention that Torrington CAFC is applicable to the adjustment at issue. See id. at 7-8.


### C.    Analysis

Commerce's decision to accept SKF's home-market support rebates, early-payment discounts and billing adjustment two was supported by substantial evidence and was fully in accordance with the post-URAA statutory language, as well as with the SAA that accompanied the enactment of the URAA because (1) Commerce verified the adjustments to determine that they were reliable and could not be reported more specifically; (2) Commerce properly determined that SKF acted to the best of its ability in reporting the adjustments; and (3) Commerce properly accepted SKF's allocation methodology after carefully reviewing the differences between such merchandise and ensuring that the allocations were not unreasonably distortive. See Final Results, 62 Fed. Reg. at 2094.

Commerce's decision to accept NTN's reported home-market early-payment discounts was supported by substantial evidence and was fully in accordance with the post-URAA statutory language, as well as with the SAA that accompanied the enactment of the URAA because (1) Commerce properly relied on verification conducted in prior reviews to gauge the accuracy of the reported adjustment; (2)

Commerce properly determined that NTN acted to the best of its ability in reporting the adjustments; and (3) Commerce properly accepted NTN's allocation methodology after carefully reviewing the differences between such merchandise and ensuring that the allocations were not unreasonably distortive. See Final Results, 62 Fed. Reg. at 2097.

Commerce's decision to accept INA's reported home-market billing adjustment two was supported by substantial evidence and was fully in accordance with the post-URAA statutory language, as well as with the SAA that accompanied the enactment of the URAA because (1) Commerce verified the adjustments to determine that they were reliable and could not be reported more specifically; (2) Commerce properly determined that INA acted to the best of its ability in reporting the adjustments; and (3) Commerce properly accepted INA's reporting of billing adjustment two after carefully reviewing the  data to ensure that INA's reporting was not unreasonably distortive. See Final Results, 62 Fed. Reg. at 2096.

After the enactment of the URAA, Commerce reevaluated its treatment of PSPAs, and since that time it treats them as adjustments to price and not as selling expenses.  Indeed, Commerce's treatment of the home-market support rebates, early-payment discounts and billing adjustments as adjustments to price instead of selling expenses is the issue left unanswered by the

pre-URAA cases upon which Torrington relies, namely, Torrington

CAFC; Koyo Seiko Co. v. United States ("Koyo"), 36 F.3d 1565 (Fed.

Cir. 1994); and Consumer Prods. Div., SCM Corp. v. Silver Reed

America Inc.("Consumer Products"), 753 F.2d 1033 (Fed. Cir. 1985).[4]

The Court disagrees with Torrington that Torrington CAFC

mandates that direct price adjustments may only be accepted when

they are reported on a transaction-specific basis.  Rather, as

Commerce correctly pointed out, Torrington CAFC merely overturned

a prior Commerce practice of treating certain allocated price

adjustments as indirect selling expenses and did not address the

propriety of the allocation methods that respondents used in

reporting the price adjustments in question.  See Final Results, 62

Fed. Reg. at 2091.  Although (1) "Commerce treated rebates and

billing adjustments as selling expenses in preceding reviews under

---

[4] In Torrington CAFC, the Court of Appeals did not hold that billing adjustments must be treated as selling expenses.  The Torrington CAFC court specifically noted that it was treating billing adjustments as selling expenses only because there was no argument offered suggesting otherwise, and the issue whether such treatment was appropriate remained open.  Torrington CAFC, at 1050 n.15.  Torrington's reliance on Koyo and Consumer Products is equally unjustified.  The Koyo court, citing Consumer Products, noted that "[d]irect expenses are 'expenses which vary with the quantity sold, such as commissions'" and did not address the issue of billing adjustments.  Koyo, 36 F.3d at 1569 n.4 (quoting Consumer Products, 753 F.2d at 1035).  Because these cases address Commerce's treatment of selling expenses, and Commerce did not treat the adjustments at issue as selling expenses, these cases are irrelevant to the issue at hand.

pre-URAA law," and (2) "previously decided that such adjustments are selling expenses and, therefore, should not be treated as adjustments to price," this did not "preclude Commerce's change in policy or this Court's reconsideration of it stance in light of the newly-amended antidumping statute [(that is, 19 U.S.C. § 1677m(e) (1994))]." Timken, 16 F. Supp. 2d at 1107. "Neither the pre-URAA nor the newly-amended statutory language imposes standards establishing the circumstances under which Commerce is to grant or deny adjustments to NV for PSPAs." Id. at 1108 (citing Torrington CAFC, 82 F.3d at 1048). Moreover, 19 U.S.C. § 1677m(e) "specifically directs that Commerce shall not decline to consider an interested party's submitted information if that information is necessary to the determination but does not meet all of Commerce's established requirements, if the [statute's] criteria are met." Id.

Commerce applied its post-URAA methodology to analyze adjustments to price, explaining that Commerce accepted PSPAs as direct adjustments to price if Commerce determined that a respondent, in reporting these adjustments, acted to the best of its ability to associate the adjustment with the sale on which the adjustment was made, rendering its reporting methodology not unreasonably distortive. Final Results, 62 Fed. Reg. at 2090. In evaluating the degree to which an allocation over scope and non-

scope merchandise may be distortive, Commerce examines "the extent to which the out-of-scope merchandise included in the allocation pool is different from the in-scope merchandise in terms of value, physical characteristics, and the manner in which it is sold." Id. Torrington's argues that Commerce's methodology is unlawful. See Torrington's Reply at 9-12. Torrington is incorrect. Although the URAA does not compel Commerce's new policy on price adjustments, the statute does not prohibit Commerce's new practice.

Commerce's "change in policy . . . substitutes a rigid rule with a more reasonable method that nonetheless ensures that a respondent's information is reliable and verifiable." Timken, 16 F. Supp. 2d at 1108. Commerce's decision to accept SKF's and NTN's allocated adjustments to price is acceptable, "especially . . . in light of the more lenient statutory instructions of [19 U.S.C. § ] 1677m(e)." Id. Accordingly, "Commerce's decision to accept the PSPAs . . . is fully in accordance with the post-URAA statutory language and directions of the SAA," and the decision to accept SKF's, NTN's and INA's adjustments was reasonable even though the adjustments were not reported on a transaction-specific basis and even though the allocations included rebates on non-scope merchandise. See id.

Torrington argues that the post-URAA statute retains the distinction between "direct" and "indirect" expenses and,

therefore, does not permit Commerce to alter its treatment of adjustments to price. See Torrington's Reply at 6-8. Torrington trivializes the statutory changes that prompted Commerce to reevaluate its treatment of adjustments and consequently revise its regulations. Because Commerce now treats PSPAs as adjustments to price rather than selling expenses, the distinction between direct versus indirect selling expenses is no longer relevant for the purpose of determining the validity of allocated price adjustments. One of the goals of Congress in passing the URAA was to liberalize certain reporting requirements imposed on respondents in antidumping reviews. Such intent is evident both in the amendments enacted by the URAA and in the SAA. The URAA amended the antidumping law to include a new subsection, 19 U.S.C. § 1677m(e). The provision states that:

> In reaching a determination under [19 U.S.C.] section 1671b, 1671d, 1673b, 1673d, 1675, or 1675b . . . the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if—-
>
>> (1) the information is submitted by the deadline established for its submission,
>> (2) the information can be verified,
>> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
>> (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
>> (5) the information can be used without undue

difficulties.

19 U.S.C. § 1677m(e).   This section of the statute liberalized

Commerce's general acceptance of data submitted by respondents in

antidumping proceedings by directing Commerce not to reject data

submissions once Commerce concludes that the specified criteria are

satisfied.[5]

Next, Torrington suggests that Commerce has improperly shifted

the burden of proof to domestic interested parties by requiring

them to produce evidence of distortion.   See, e.g., Torrington's

Reply at 12-13.   This argument is without merit.   As a routine part

of its antidumping practice, Commerce accepts a range of reporting

methodologies and allocations adopted by respondents.   In each of

those instances it could be asserted that the effect of Commerce's

---

[5] Consistent with § 1677m(e), the SAA states that "[t]he Administration does not intend to change Commerce's current practice, sustained by the courts, of allowing companies to allocate these expenses when transaction-specific reporting is not feasible, provided that the allocation method used does not cause inaccuracies or distortions." SAA at 823-24.   Therefore, the statute and the accompanying SAA both support Commerce's use of allocations in circumstances such as those present here. Furthermore, Commerce's treatment of the allocated billing adjustments is consistent with its new antidumping regulations, which permit Commerce to "consider allocated expenses and price adjustments when transaction-specific reporting is not feasible," 19 C.F.R. § 351.401(g)(l), and it is also consistent with Commerce's practice not to "reject an allocation method solely because the method includes 'out-of-scope' merchandise . . . ." Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. at 27,348.

acceptance is to "shift the burden of proof" to the petitioner to demonstrate why it was inappropriate to accept the reporting methodology at issue. But the mere fact of accepting an adjustment as reported cannot be a sufficient ground for rejecting Commerce's decision. It would be anomalous indeed to expect a respondent to provide Commerce, in addition to the information on the basis of which Commerce could conclude that the respondent's reporting methods are not distortive, with a proof of the validity of Commerce's determination of that sort. Such a scheme would effectively allow the respondent to bind Commerce, restricting Commerce's inherent power to investigate, examine and render a decision.

In determining whether SKF's and NTN's allocation over scope and non-scope merchandise was unreasonably distortive, or whether INA's reporting of adjustments on a product- and invoice-specific basis was unreasonably distortive, Commerce reasonably has not required respondents to demonstrate the non-distortive nature of the allocation directly, for example, by compelling them to identify separately the adjustments on scope merchandise and compare them to the results of allocations over both scope and non-scope merchandise. Such a burdensome exercise would defeat the entire purpose underlying the more flexible reporting rules, by compelling the respondent to go through the enormous effort that

the new rules were intended to obviate. Rather, Commerce has adopted criteria by which Commerce itself could determine whether an allocation over scope and non-scope merchandise was likely to cause unreasonable distortions.

In the case at hand, Commerce properly concluded that the allocation by SKF of the price adjustments reported over scope and non-scope merchandise was not unreasonably distortive, having been "granted in proportionate amounts with respect to sales of out-of-scope and in-scope merchandise." Final Results, 62 Fed. Reg. at 2094. SKF's home-market support rebates were reported for each distributor/dealer as a fixed and constant percentage of all sales to such distributor/dealer, and upon verification, Commerce found no discrepancies. See SKF's Resp. at 30-31; Home Market Verification of SKF GmbH (SKF) Sales Questionnaire Response, Investigation No. A-428-801, Admin. Rev. 1994-95, at 15. SKF's home-market early-payment discounts were not allocated over total sales or customer-specific adjustments; they were reported based on transaction-specific eligibility using transaction-specific payment terms in a manner which excluded out-of-scope merchandise. See SKF's Resp. at 32-35. At verification, Commerce determined that this method reflects the nature in which SKF does business and that its methodology is not unreasonably distortive. See Final Results, 62 Fed. Reg. at 2094. SKF reported home-market billing adjustment

two using a customer-specific allocation, which Commerce found to be the most reasonable and non-distortive, given the adjustment's relationship to multiple invoices, products, or invoice lines and the large number of transactions.  See id.

Commerce also properly concluded that the allocation by NTN of the home-market early-payment discounts reported over scope and non-scope merchandise was not unreasonably distortive.  Similar to SKF's early-payment discount, NTN's adjustment is unlikely to result in distortion because the discounts are granted for payment of an entire invoice encompassing several transactions.  Distortion would occur if the discount was granted to a customer paying early on an invoice covering only non-subject merchandise, and there is no evidence that this occurred.  Although Commerce did not verify NTN's response for this review, Commerce verified this adjustment in the fourth review, and NTN indicated that its methodology in the fourth review is the same as the one used in the present review. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders, 60 Fed. Reg. 10,900, 10,934 (Feb. 28, 1995).  Moreover, Commerce found no indication of distortion in the instant review.  See Final Results, 62 Fed. Reg. at 2097.

Additionally, Commerce was justified in concluding that INA's reporting of its billing adjustment on a product- and invoice-specific basis was not unreasonably distortive.  INA reported the adjustment on an invoice-specific basis, pursuant to Commerce's instructions.[6]  Although no allocation was used, Commerce verified INA's reporting and confirmed that INA had not reported sales on out-of-scope merchandise.  See Sixth Administrative Review of Antidumping Duty Orders on AFBs from Germany: Verification of Home Market Sales Information Submitted by INA Walzlager Schaeffler KG (06/28/96) (Case No. A-428-801) at 3-4.  Consequently, the billing adjustment related to those sales would not involve out-of-scope merchandise.

---

[6]  In the Final Results, Commerce stated the following: "INA reported this adjustment on an invoice-specific basis. Where INA had more than one transaction on an invoice, INA used the same fixed and constant percentage for all transactions on the invoice." 62 Fed. Reg. at 2096.  INA maintains that Commerce incorrectly described the way in which INA reported the adjustment since no allocation was actually used, and that INA reported the adjustment on a product- and invoice-specific basis.  See INA's Br. at 6-7. INA also contends that Commerce's misstatement was harmless, since Commerce verified that INA's billing adjustments were traced to appropriate source documents and correctly concluded that no distortion occurred.  See id.  The Court agrees that Commerce's misstatement was harmless.  Commerce's examination of the allocation methodology is designed to determine whether distortion occurred.  Since Commerce addressed the distortion problem at verification, and found that no distortion occurred, it is unnecessary to discuss Commerce's misstatement any further.

Torrington labels Commerce's conclusion that SKF's, NTN's and INA's methodologies would not result in distortive allocations as mere "beliefs" and asserts that Commerce failed to verify this point adequately. See Torrington's Mem. at 26-28. Torrington fails to acknowledge the appropriate level of deference owed to Commerce's verifications. "[A] verification is a spot check and is not intended to be an exhaustive examination of the respondent's business. [Commerce] has considerable latitude in picking and choosing which items it will examine in detail." PMC Specialties Group, Inc. v. United States, 20 CIT 1130, 1134, 1996 WL 497155, *4 (1996) (quoting Monsanto Co. v. United States, 12 CIT 937, 944, 698 F. Supp. 275, 281 (1988)). In fact, "Commerce enjoys 'wide latitude' in its verification procedures." Pohang Iron and Steel Co. v. United States, Slip Op. 99-112, 1999 WL 970743, *16 (October 20, 1999); see also American Alloys, Inc. v. United States, 30 F.3d 1469, 1475 (Fed. Cir. 1994); Carlisle Tire & Rubber Co. v. United States, 9 CIT 520, 532, 622 F. Supp. 1071, 1082 (1985) ("It is within the discretion of Commerce to determine how to verify" and "due deference will be given to the expertise of the agency."). The Court defers to the agency's sensibility as to the depth of the inquiry needed. In the absence of evidence in the record suggesting the need to examine further the supporting evidence itself, the agency may accept the credibility of the document at face value. See Pohang, 1999 WL 970743, *16 (relying on PPG

Indus., Inc. v. United States, 15 CIT 615, 620, 781 F. Supp 781, 787 (1991)).  To "conclude otherwise would leave every verification effort vulnerable to successive subsequent attacks, no matter how credible the evidence and no matter how burdensome on the agency further inquiry would be."  Id. at *16 n.32.  Torrington may not usurp Commerce's role as fact finder and substitute their analysis of the data for the result reached by Commerce in the verification report.  The Court will not supersede Commerce's conclusions so long as it applies a reasonable standard to verify material submitted and the verification is supported by such relevant evidence as a reasonable mind might accept.

Finally, Torrington asserts that Commerce improperly determined that SKF, NTN and INA acted to the best of their ability in reporting adjustments.  See Torrington's Mem. at 2-4. Torrington's assertion is without merit.  SKF's, NTN's and INA's adjustments were granted over both scope and non-scope merchandise without reference to any particular model or transaction, and Commerce could not have reasonably expected them to be recorded or reported to Commerce in a manner more specific than that which was used.  It was equally appropriate for Commerce to consider, as a part of its decision whether SKF, NTN and INA acted to the best of their ability in reporting the adjustments, the volume of adjustments when deciding whether it is feasible to report these

adjustments on a more specific basis.  SKF's, NTN's and INA's home-market sales comprised hundreds of thousands of transactions and thousands of adjustments.  In light of the size of this database, Commerce reasonably found that "given the extremely large volume of transactions involved in these AFBs reviews[,] [i]t is inappropriate to reject allocations that are not unreasonably distortive in favor of facts otherwise available where a fully cooperating respondent is unable to report the information in a more specific manner." Final Results, 62 Fed. Reg. at 2090.  The large volume of data is precisely one of the factors that one would expect Commerce to consider in deciding whether a respondent has acted to the best of its ability in reporting a given adjustment.

In sum, the Court finds that Commerce's decision to accept SKF's, NTN's and INA's reported home-market adjustments was supported by substantial evidence and was fully in accordance with the post-URAA statutory language and the SAA.  The record demonstrates that the requirements of 19 U.S.C. § 1677m(e) were satisfied by the respondents: (1) the reported adjustments were submitted in a timely fashion, see 19 U.S.C. § 1677m(e)(1);  (2) the information submitted was verified by Commerce or, in NTN's case, was verifiable, see 19 U.S.C. § 1677m(e)(2) ("the information can be verified"); (3) the respondents' information was not so incomplete that it could not serve as a basis for reaching a

determination, see 19 U.S.C. § 1677m(e)(3);  (4) respondents demonstrated that they acted to the best of their abilities in providing the information and meeting Commerce's new reporting requirements, see § 1677m(e)(4); and (5) there was no indication that the information was incapable of being used without undue difficulties.  See § 1677m(e)(5).

Commerce's determinations with respect to SKF, NTN and INA was also consistent with the SAA.  The Court agrees with Commerce's finding in the Final Results that given the extremely large volume of transactions, the level of detail contained in normal accounting records, and time constraints imposed by the statute, the reporting and allocation methodologies were reasonable.  This is consistent with the SAA directive under § 1677m(e), which provides that Commerce "may take into account the circumstances of the party, including (but not limited to) the party's size, its accounting systems, and computer capabilities." SAA at 865.  Thus, the Court finds that Commerce properly considered the ability of SKF, NTN and INA to report its billing adjustments on a more specific basis.  Accordingly, the Court concludes that Commerce's acceptance of SKF's, NTN's and INA's reported adjustments was supported by substantial evidence and fully in accordance with law.

## CONCLUSION

The Court remands this case to Commerce to: (1) first attempt to match FAG's and SKF's United States sales to similar home-market sales before resorting to CV; (2) exclude any transactions that were not supported by consideration from FAG's and SKF's United States sales databases and to adjust the dumping margins accordingly; (3) include all expenses included in "total United States expenses" in the calculation of "total expenses" for FAG's and INA's CEP profit ratios; (4) reconsider its decision to calculate SKF's home-market credit expense rate based upon price and then apply that rate to cost; and (5) convert certain expenses from foreign currency to United States dollars in calculating EP and CEP for INA.  Commerce is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:     February 2, 2001
           New York, New York